# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48692

|  |  |  |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, June 2021 Term |
| | ) | |
| v. | ) | Opinion Filed: October 5, 2021 |
| | ) | |
| JACOB STEELE RANDALL, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Appeal from the District Court of the Sixth Judicial District of the State of Idaho, Bannock County, Robert C. Naftz, District Judge.

The district court's denial of the motion to suppress is <u>reversed</u> and the judgment of conviction is <u>vacated</u>.

Eric D. Fredericksen, Idaho Public Defender, Boise, for appellant. Sally Cooley argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent. Andrew Wake argued.

_____

BRODY, Justice.

Today we consider whether the Fourth Amendment applies when a police officer's drug-detection dog does what the officer may not—trespasses into a stopped car during a drug trafficking investigation without a warrant, probable cause, or consent. A drug dog leapt into Jacob Steele Randall's rental car during what was supposed to have been an exterior sniff. After the dog alerted to the presence of narcotics, officers searched the car and discovered 65 pounds of marijuana. Relying on an Idaho Court of Appeals case providing that a drug dog's "instinctive" actions do not violate the Fourth Amendment, the district court denied Randall's motion to suppress evidence of the marijuana because it found the dog's entry was instinctive. We reverse because the rule articulated by the Court of Appeals and applied by the district court is inconsistent with the Fourth Amendment.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

In early September 2018, Randall drove past Idaho State Police Corporal Tyler Scheierman on Interstate 86 while Scheierman was observing traffic from the interstate median. Though Scheierman estimated Randall's car to be traveling at the speed limit, he noticed that Randall slowed as he approached the marked patrol car and was "sitting in a very rigid, uncomfortable, unnatural driving position, and pressing himself backwards in his seat" such that his face was obscured from Scheierman's view as he passed. Based on what he described as an "abnormal" response to seeing a marked patrol car, Scheierman decided to follow Randall to "take a closer look." After Randall passed a tractor-trailer and failed to signal for the required five seconds before changing lanes, Scheierman stopped Randall.

Scheierman asked to see Randall's license, registration, and, upon learning Randall had rented the car, the rental agreement. As Randall gathered the documents, Scheierman talked with Randall about his travel plans and noticed that Randall's hands were "visibly shaking" and the "carotid artery in his neck [was] beating profusely." Randall said he was driving home to St. Paul, Minnesota, from Las Vegas, Nevada, where he had flown for a vacation because the flight cost only $75. This statement drew Scheierman's attention because the rental agreement showed it had cost more than $500 to rent the car, and, in Scheierman's words, "it makes no sense to me to fly out, and then to drive back, especially . . . [since] it's so much cheaper to fly." Further, as Scheierman later testified, he was "familiar with current trends" in drug trafficking, including traffickers "flying to a destination and driving contraband back." Finally, Scheierman noticed the rental car had a "lived-in look," with "food wrappers, gallon jugs of water, [and] toiletries strewn across" the vehicle's interior, which he testified is "consistent with people . . . traveling continuously, . . . involved in criminal activity." For these reasons, Scheierman asked Randall to get out of his car and accompany him to his patrol car while he validated Randall's driver's license and checked for warrants.

After the license and warrant check came back clear, Scheierman told Randall his travel plans were consistent with drug trafficking and asked Randall whether he would consent to a drug dog sniff of the exterior of his car. Randall agreed to the sniff. Scheierman retrieved his drug detection dog, Bingo, from his patrol car.

Scheierman's dashboard camera captured a video of the sniff. The video shows that Bingo moved rapidly ahead of Scheierman toward the driver's side window, which had been left

2

open by Randall. When he arrived at the driver's side door, Bingo immediately leapt into the car through the open window. However, Bingo's hindquarters caught just outside the window and Scheierman gave Bingo a boost, pushing him fully into the car. As Scheierman testified, he gave Bingo the boost to prevent Bingo from injuring himself or causing damage to the door of the car. Less than three seconds elapsed after Bingo left the side of Scheierman's patrol car before he was fully inside Randall's rental car, and he spent 16 seconds in the rental car before leaping back out. Bingo's behavior inside the car is not visible in the video, but Scheierman testified that Bingo proceeded to the back seat of the car and alerted there to the presence of narcotics.

Once back outside, Bingo sniffed his way around the car before leaping through the driver's side window again. After emerging from the car the second time, Scheierman "redeployed [Bingo] onto the trunk of the vehicle." Shortly thereafter, Bingo alerted on the trunk of the car. The total duration of the sniff was slightly less than one minute, with Bingo inside the car for 21 seconds. Following the sniff, Scheierman conducted a warrantless search of the car and found approximately 65 pounds of marijuana stuffed into duffel bags in the trunk.

The State charged Randall with trafficking marijuana in excess of 25 pounds in violation of Idaho Code section 37-2732B(a)(1)(C). Randall filed a motion to suppress evidence of the marijuana, alleging violation of his Fourth Amendment rights. The district court held a suppression hearing at which Scheierman testified and the video of the sniff was admitted into evidence. After the hearing, the parties submitted written arguments.

Randall argued that Scheierman violated his Fourth Amendment rights by impermissibly expanding the purpose and duration of the traffic stop. Specifically, Randall argued that Scheierman lacked reasonable suspicion Randall had committed any offense other than the traffic violation. Therefore, once Scheierman learned that Randall's driver's license was valid and there were no warrants for his arrest, the purpose of the stop was complete and Scheierman could not continue to detain Randall and conduct the dog sniff. Further, he argued that his Fourth Amendment rights were violated when Bingo entered his car before probable cause was established.

The State argued that Scheierman was justified in making the initial stop based on Randall's failure to signal lane changes properly, and that Scheierman developed reasonable suspicion of drug trafficking during the traffic stop, justifying expansion of the scope of the stop. As to Bingo's sniff of the interior of the car, the State argued that Bingo leapt into the car of his

3

own accord, and therefore, no "search" had occurred for purposes of the Fourth Amendment. At the end of its argument, the State mentioned that Bingo alerted both inside and outside of the car, but it did not explain how this fact was relevant to a probable cause analysis, nor did the State raise any defenses to suppression.

The district court denied Randall's motion to suppress, holding that Scheierman had reasonable suspicion of drug trafficking before extending the duration of the stop to include a drug sniff. Further, citing the Idaho Court of Appeals decision in *State v. Naranjo*, 159 Idaho 258, 359 P.3d 1055 (Ct. App. 2015), and caselaw from several federal courts, the district court held that an "instinctive" entry by a drug dog into a vehicle is not a search within the meaning of the Fourth Amendment:

> [A]bsent police misconduct, the instinctive actions of trained drug dogs do not expand the scope of an otherwise legal dog sniff to an impermissible search without a warrant or probable cause. The term instinctive implies that a dog enters a car without assistance, facilitation, or other intentional action by its handler. Thus, during a lawful detention, when a drug dog's leap into a car is instinctual rather than orchestrated by police conduct, courts have upheld the legality of such a search. Further, a dog's independent act of entering a vehicle is lawful where the dog was attracted into the car by the smell of contraband.

Because the district court found Bingo's leap into the car was instinctive, it held there had been no Fourth Amendment violation, and it denied Randall's motion to suppress:

> Based upon the testimony and the evidence presented, Trooper Scheierman's drug dog made [an] independent entry into the Defendant's car because the dog detected an odor emanating from the vehicle. While Trooper Scheierman testified that he did assist the dog's entry into the vehicle, that assistance was only given to prevent injury to the animal and car and came only after the dog had independently placed its paws on the open front driver's side window and jumped inside. Trooper Scheierman did nothing to initiate the dog's entry into the vehicle.

After the denial of his motion to suppress, Randall entered a conditional plea of guilty to a reduced charge of trafficking between five and 25 pounds of marijuana under Idaho Code section 37-2732B(a)(1)(B). The district court accepted Randall's plea and sentenced him to seven years in prison, with three years fixed, and imposed a $10,000 fine. Randall timely appealed the denial of his motion to suppress and appealed from his sentence, arguing it was excessive.

## II. STANDARD OF REVIEW

We review the denial of a motion to suppress using a bifurcated standard. *State v. Danney*, 153 Idaho 405, 408, 283 P.3d 722, 725 (2012). We will "accept the trial court's findings

4

of fact unless they are clearly erroneous but will freely review the trial court's application of constitutional principles to the facts found." *Id.*

## III. ANALYSIS

Randall argues the district court erred in denying his motion to suppress on two grounds. First, Randall argues the traffic stop was unconstitutionally prolonged because Scheierman lacked reasonable suspicion of drug trafficking activity in order to conduct the dog sniff of his car. Second, Randall argues the sniff was an unconstitutional search because Bingo entered his car before probable cause had been established. As set out below, we hold that the traffic stop was not unconstitutionally prolonged, but that Randall's Fourth Amendment rights were violated when Bingo leapt inside his car.

### A. The district court did not err in determining that Trooper Scheierman had reasonable suspicion of drug trafficking to detain Randall for a drug sniff.

Randall argues that Scheierman unconstitutionally prolonged his detention by conducting the sniff because he lacked reasonable suspicion to expand the traffic stop into a drug investigation. Relying on *State v. Kelley*, 160 Idaho 761, 379 P.3d 351 (Ct. App. 2016), Randall asserts that nervousness and unusual travel plans cannot form the basis for reasonable suspicion and argues that "none of the other relevant facts support a determination of reasonable suspicion." The State argues that Scheierman had reasonable suspicion that Randall was involved in drug trafficking under the totality of the circumstances.

The Fourth Amendment of the United States Constitution prohibits unreasonable searches and seizures. "The stop of a vehicle by law enforcement constitutes a seizure of its occupants to which the Fourth Amendment applies." *State v. Linze*, 161 Idaho 605, 607–08, 389 P.3d 150, 152–53 (2016) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). The reasonableness of such a stop is analyzed as an investigative detention. *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). An investigative detention does not require an officer to have probable cause to believe that a crime has been committed, but the detention must be based on something "more than a mere hunch or 'inchoate and unparticularized suspicion.' " *State v. Gonzales*, 165 Idaho 667, 673, 450 P.3d 315, 321 (2019) (quoting *State v. Bishop*, 146 Idaho 804, 811, 203 P.3d 1203, 1210 (2009)). The detention must be supported by specific, articulable facts, that the detained party has committed, is committing, or is about to commit a crime. *Terry v. Ohio*, 392 U.S. 1, 19–20 (1968). Whether an officer's suspicion is reasonable is evaluated under the totality of circumstances. *United States v. Cortez*, 449 U.S. 411, 417 (1981). Further, the detention must be

5

"reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 19–20.

Where a detention is justified by a traffic infraction, "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *State v. Hale*, 168 Idaho 863, ___, 489 P.3d 450, 454 (2021) (quoting *Rodriguez*, 575 U.S. at 354). "The purpose of a stop is not permanently fixed, however, at the moment the stop is initiated, for during the course of the detention there may evolve suspicion of criminality different from that which initially prompted the stop." *State v. Sheldon*, 139 Idaho 980, 984, 88 P.3d 1220, 1224 (Ct. App. 2003); *accord Hale*, 168 Idaho at ___, 489 P.3d at 454 ("[A] traffic stop may be permissibly extended if, during the course of effectuating the stop's mission, officers develop reasonable suspicion of some unrelated criminal offense.")

Here, Randall does not dispute that Scheierman was justified in his initial stop based on the signaling violation; the only question is whether the district court correctly determined Scheierman's expansion of the scope of the stop to include a drug investigation was constitutionally permissible. We hold that the district court did not err because the facts known to Scheierman before prolonging the stop were sufficient to support a reasonable suspicion that Randall was involved in drug trafficking. Specifically, Scheierman's suspicion was reasonable based on (1) Randall's travel plans that were consistent with drug trafficking and inconsistent with his stated motivation for traveling; (2) Randall's slowing below the speed limit as he approached Scheierman's patrol car, rigid driving position with his face obscured from view as he passed, and nervous appearance during the stop; and (3) the "lived-in" look of the car, which was suggestive of continuous travel while trafficking drugs.

Randall's contention that Scheierman lacked reasonable suspicion under *Kelley* is unpersuasive. In *Kelley*, the defendant had a "nervous demeanor, evidenced by Kelley trembling, avoiding eye contact, and a pulsating artery" when stopped for speeding. *Id.* at 762, 379 P.3d at 352. He also told the officer he did not own the car but was driving it from Oregon to Nebraska to return it to a friend. *Id.* After concluding the traffic-related purpose of the stop, the officer prolonged Kelley's detention while another officer conducted a drug dog sniff of the exterior of the car. *Id.* The dog alerted and the search that followed revealed more than 22 pounds of marijuana. *Id.* The defendant moved to suppress the evidence of the marijuana, arguing officers lacked reasonable suspicion to prolong the stop for the dog sniff. *Id.* at 762, 379 P.3d at 352. The

6

State responded that the defendant's nervousness, his unusual travel plans, and his travel along Interstate 84 (which the government asserted was a known "drug trafficking corridor") provided reasonable suspicion for the prolonged detention. *Id.*

The Court of Appeals disagreed. It held that Kelley's unusual travel plans did not give rise to reasonable suspicion because objective facts did not link the plans to illegal activity. *Id* at 764, 379 P.3d at 354. Further, the court noted that using the interstate "cannot give rise to reasonable suspicion to search a vehicle" even though "it may be used by individuals engaged in a whole host of criminal activity" because "it would subject thousands of innocent travelers to an invasion of their privacy for no more of a reason than the use of the road." *Id.* at 763, 379 P.3d at 353. Finally, the court held that nervousness during a traffic stop is of "limited significance in establishing the presence of reasonable suspicion" because many people are nervous "when confronted by law enforcement regardless of criminal activity." *Id.* (quoting *State v. Neal*, 159 Idaho 919, 924, 367 P.3d 1231, 1236 (Ct. App. 2016)) In light of these facts, the Court of Appeals held that officers did not have reasonable suspicion to justify prolonging Kelley's detention. *Id.* at 764, 379 P.3d at 354.

This case is distinguishable. Most importantly, Randall's travel plans were not simply "unusual," like the defendant's plans in *Kelley*. Instead, Randall's one-way flight followed by a long return in a rental car was consistent with a "current trend" in drug trafficking, according to testimony by Scheierman, which was credited by the district court. Though there are many innocent reasons a person might fly to a destination and return via car Randall's plans were more suggestive of illegal activity than the mere use of an interstate at issue in *Kelley*. And significantly, Randall's explanation for his trip—that he wanted to take advantage of inexpensive airfare—was undermined by the fact that he paid dramatically more to return to Minnesota in a rented car than he had paid to fly to Las Vegas in the first instance.

Further, while we agree with Randall (and the Court of Appeals) that a driver's nervousness during a stop is of limited significance, the significance of Randall's nervousness is somewhat amplified by his "abnormal" behavior even *before* he was stopped. Likewise, the "lived-in" look of Randall's rental car, taken alone, does not strongly contribute to reasonable suspicion because there are many wholly innocent reasons a car may appear messy or lived-in. However, whether an officer's suspicion is reasonable depends on the totality of the circumstances known to the officer, not the weight of facts considered in isolation. *United States*

*v. Cortez*, 449 U.S. 411, 417 (1981). Here, the totality of the facts known to Scheierman was sufficient to trigger a reasonable suspicion that Randall was involved in drug trafficking activity. Therefore, Randall's Fourth Amendment rights were not violated by the prolongation of the stop to allow Bingo to sniff the car.

**B. The district court erred in denying Randall's motion to suppress because the drug dog's interior sniff was an unconstitutional search.**

Relying on the Idaho Court of Appeals decision in *State v. Naranjo*, 159 Idaho 258, 359 P.3d 1055 (Ct. App. 2015), the district court held that the interior sniff of Randall's car was not an unconstitutional search because Bingo's entry was "instinctual," rather than encouraged by Scheierman. Randall argues that *Naranjo* is inconsistent with the Supreme Court of the United States' decision in *United States v. Jones*, 565 U.S. 400 (2012). Under the *Jones* decision, Randall asserts that any warrantless entry by a drug dog into a car prior to the establishment of probable cause is an unconstitutional search, regardless of whether the dog's entry was instinctive or otherwise, and that the district court erred in denying his motion to suppress.

The State argues that, as a threshold matter, we need not consider whether *Naranjo* is consistent with *Jones* because Bingo alerted on the trunk of the car after he jumped back outside of the car. According to the State, the fact that Bingo alerted outside the car establishes that his interior alert was not the "but-for" cause of the discovery of the evidence and, therefore, suppression is not warranted. As authority for its "but-for" argument, the State cites cases involving three different exceptions to the exclusionary rule—attenuation, inevitable discovery, and the independent source doctrine. The State's argument seems best characterized as an inevitable discovery argument because it alleges there is no "reason to think that Bingo would not have alerted on the exterior trunk of the car if he had not first jumped into the car."

The State's argument, however it may be characterized, is not preserved for appeal. This Court requires that "the issue and the party's position on the issue must be raised before the trial court for it to be properly preserved for appeal." *State v. Gonzalez*, 165 Idaho 95, 99, 439 P.3d 1267, 1271 (2019). The State claims its argument was raised in the district court by the following passage in the State's brief opposing Randall's motion to suppress:

> After this initial drug indication, Trooper Scheierman did remove Bingo from the inside of the vehicle and had him continue with the sniff of the vehicle around the outside of the vehicle. Bingo again indicated near the backside of the vehicle near the trunk. As testified to by Trooper Scheierman, Bingo indicated both on the inside and the outside of Defendant Randall's vehicle.

8

On these circumstances, it can be found that the K-9 sniff was not an illegal search of the vehicle and any and all evidence obtained from the sniff should not be suppressed.

This is insufficient to preserve the issue. While the passage above alleges facts (Bingo alerted both inside and outside the car) and it states a conclusion (the evidence should not be suppressed), it does not contain any argument. That is, it does not contain an application of the law to the facts to support the conclusion stated. Therefore, the State's argument on appeal is waived because it was not raised below.

Next, we turn to Randall's argument that the district court erred in relying on *Naranjo*. As already noted, the Fourth Amendment protects citizens against unreasonable searches and seizures. A warrantless search is presumed unreasonable unless it falls within a recognized exception to the warrant requirement. *State v. Anderson*, 154 Idaho 703, 706, 302 P.3d 328, 331 (2012). Under the automobile exception, officers may conduct a warrantless search of a vehicle when they have probable cause to believe that the vehicle contains contraband or evidence of a crime. *Id.* A reliable drug dog's alert on the exterior of a car, standing alone, is sufficient to establish probable cause for a warrantless search of the interior. *Id.*

Critically, a drug dog's sniff of the *exterior* of a car does not require a warrant because it is not a "search" for purposes of the Fourth Amendment. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005). As the Supreme Court of the United States held in *Caballes*, the use of dog sniffs as an investigatory tool is "sui generis" under the Fourth Amendment:

> Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment. We have held that any interest in possessing contraband cannot be deemed "legitimate," and thus, governmental conduct that only reveals the possession of contraband "compromises no legitimate privacy interest." . . . [A] canine sniff by a well-trained narcotics-detection dog [is] "sui generis" because it discloses only the presence or absence of narcotics, a contraband item. . . .
> Accordingly, the use of a well-trained narcotics-detection dog—one that does not expose noncontraband items that otherwise would remain hidden from public view—during a lawful traffic stop, generally does not implicate legitimate privacy interests.

*Id.* at 408–09 (citations and quotation marks omitted).

That said, in *United States v. Jones*, the Supreme Court held that the Fourth Amendment applies where law enforcement "physically occupie[s]" a vehicle "for the purpose of obtaining information" because the Fourth Amendment protects *property interests* in addition to *privacy*

9

*interests*. 565 U.S. 407–08. In that case, the government attached a GPS device to Jones' vehicle without a warrant. The government argued this was not a "search" because Jones did not have a reasonable expectation of privacy in the undercarriage of his car or in the location of his vehicle as he drove on public streets. *Id.* at 406. The Court disagreed. It held that the reasonable expectation of privacy test articulated by *Katz v. United States*, 389 U.S. 347, 351 (1967), does not encompass all of the Fourth Amendment's protections:

> Fourth Amendment rights do not rise or fall with the *Katz* formulation. At bottom, we must assure preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted. As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. *Katz* did not repudiate that understanding.

565 U.S. 406–07 (brackets, citation, and footnote omitted). Accordingly, the court held that while a trespass alone is not a "search," a trespass for the purpose of obtaining information *is* a search under the Fourth Amendment. *Id* at 408. Because the government had physically intruded upon Jones' car by attaching an information-collecting device to it, the Court held a search had occurred. *Id.* at 404–05.

The Supreme Court applied this principle again in *Jardines*. In that case, officers led a drug dog onto the curtilage of Jardines' home without consent, a warrant, or exigent circumstances, and the dog promptly alerted to the presence of narcotics. 569 U.S. 3–4. Based on this alert, the officers obtained a warrant, searched the home, found marijuana plants, and charged Jardines with drug trafficking. *Id.* Jardines moved to suppress evidence of the marijuana discovered as a result of the dog sniff. *Id.* Noting that under *Caballes* an "investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest," the government argued that no search had occurred, and the evidence should not be suppressed. The Court flatly rejected the government's argument. Citing *Jones*, the Court opined that "[o]ne virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy." *Id.* at 11. Because "the officers learned what they learned only by physically intruding on Jardines' property to gather evidence[,]" nothing more was needed to establish that a search had occurred, and that suppression was warranted.

Though the Supreme Court has not directly addressed the question, *Jones* and *Jardines* make clear that a drug dog's trespass into a car during an exterior sniff converts what would be a non-search under *Caballes* into a search. However, in *Naranjo*, the Idaho Court of Appeals

10

added an asterisk to this analysis. In *Naranjo*, a drug dog alerted to the presence of narcotics after it momentarily put its nose through a vehicle window left open by the defendant. 159 Idaho 259, 359 P.3d at 1056. The defendant argued this intrusion was a warrantless search in violation of his Fourth Amendment rights because the dog had exceeded the scope of an exterior sniff. *Id.* at 259–60, 359 P.3d at 1056–57. Relying on several federal cases, the Court of Appeals disagreed. *See id.* at 259, 359 P.3d at 1056 (citing *United States v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012); *United States v. Pierce*, 622 F.3d 209, 214–15 (3d Cir. 2010); *United States v. Lyons*, 486 F.3d 367, 373–74 (8th Cir. 2007); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989); *United States v. Hutchinson*, 471 F.Supp.2d 497, 510–11 (M.D.Pa. 2007); *United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998)). The Court of Appeals held that a drug dog's independent actions do not implicate the Fourth Amendment; therefore, the determinative consideration was whether an entrance was "facilitated or encouraged" by officers. *Naranjo*, 159 Idaho at 259–60, 359 P.3d at 1056–57. Because the trial court had determined that the dog's entry was instinctive rather than encouraged, the Court of Appeals concluded no Fourth Amendment violation had occurred. *Id.*

As the State and dissent both note, the Court of Appeals is not alone in its embrace of the rule that a dog's instinctive entry into a car during an exterior sniff does not implicate the Fourth Amendment. However, the dissent's statement that the "vast majority of appellate courts to consider this issue" have adopted the rule, implies that the weight of authority supporting the rule is greater than it is. Only four federal appellate courts (the Third, Sixth, Eighth, and Tenth Circuit Courts of Appeal) have clearly adopted the rule, while a fifth (the Seventh Circuit) has considered an argument under the rule without expressly adopting it. *See United States v. Guidry*, 817 F.3d. 997, 1006 (7th Cir. 2016); *United States v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012); *United States v. Pierce*, 622 F.3d 209, 214–15 (3d Cir. 2010); *United States v. Lyons*, 486 F.3d 367, 373–74 (8th Cir. 2007); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989). More importantly, three of the four circuit courts clearly adopting the rule did so in cases decided before *Jones*'s clarification and re-affirmation of the Fourth Amendment's property rights baseline. *See Pierce*, 622 F.3d at 209; *United States v. Lyons*, 486 F.3d at 367; *Stone*, 866 F.2d at 359. The fourth circuit court to adopt the rule did so in a case decided only six months after *Jones*, and its opinion does not suggest that the applicability of *Jones* was argued by the parties or considered by the court. *See Sharp*, 689 F.3d at 616. As for state appellate courts, it appears

11

that courts in fewer than half the states have squarely addressed the rule (many in unpublished opinions) and only two state appellate courts outside Idaho have adopted the rule in opinions published after *Jones. See State v. Miller*, 766 S.E.2d 289, 294 (N.C. 2014); *People v. Canizalez-Cardena*, 979 N.E.2d 1014, 1021 (Ill. App. Ct. (2012). But in any event our duty is to interpret the Constitution, not to follow juridical trends, and we reject the instinctive entry rule because it cannot be reconciled with the Fourth Amendment.

There are two scenarios in which an entry by a drug dog not affirmatively encouraged or facilitated by its handler may be deemed "instinctive" under the rule in *Naranjo* and its sister cases: (1) having already detected an odor of narcotics, a dog's entry may be "instinctive" because it was tracing the odor to its source, or (2) having not yet detected an odor of narcotics, a dog's entry may be "instinctive" because it is searching for an odor to trace as a result of its training. At the outset, we note that in either scenario, description of the dog's behavior as "instinctive" is inapt because there is nothing innate about a dog seeking out narcotics. But the flaws in the instinctive entry rule go beyond semantics. Namely, application of the rule in the first scenario is incompatible with the probable cause requirement for the warrantless search of an automobile, and application of the rule in the second scenario is incompatible with *Jones* and *Jardines*.

We turn first to the conflict between the instinctive entry rule and the probable cause requirement. Under the automobile exception to the warrant requirement, officers may conduct a warrantless search of a vehicle if they have probable cause to believe it contains contraband or evidence of a crime. *State v. Anderson*, 154 Idaho 703, 706, 302 P.3d 328, 331 (2012). "Probable cause is established when the totality of the circumstances *known to the officer* at the time of the search would give rise—in the mind of a reasonable person—to a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. (citing *State v. Josephson*, 123 Idaho 790, 792–93, 852 P.2d 1387, 1389–90 (1993) (emphasis added). However, the instinctive entry rule removes the focus from where it must be—the circumstances known to an officer at the time of a search—and focuses on what motivated the behavior of the officer's dog. Further, by turning the inquiry away from what was known to the officer, the rule risks that courts will draw their own post hoc conclusions about the significance of a drug dog's pre-entry behavior without competent evidence on which to rely.

12

That is what appears to have happened here. Neither the video nor Scheierman's testimony support that Bingo alerted to the presence of narcotics in the three seconds between the moment he was deployed and the moment he entered Randall's car. While evidence was introduced that Bingo was trained to follow a scent of narcotics to its source and that Bingo entered Randall's car, no evidence supported that Bingo entered Randall's car *because* he detected the odor of narcotics. Instead, the district court appears to have drawn its conclusion about Bingo's reason for jumping into the car based on its own interpretation of the dog's behavior.

Certainly, where competent evidence exists to explain why a drug dog has entered a car, the instinctive entry rule could be applied consistently with the Fourth Amendment. For instance, if Bingo had alerted before his entry and Scheierman believed the dog had detected the odor of narcotics, Scheierman could have testified about Bingo's behavior and explained its significance considering Bingo's training. If so, the district court might have concluded that Bingo entered Randall's car "instinctively." However, if such evidence had been presented in the district court, there would have been no need for it to apply the instinctive entry rule at all; instead, it could simply have considered whether the circumstances known to Scheierman were sufficient to establish probable cause. Indeed, the only type of evidence from which a court could properly conclude that a dog has followed a scent of narcotics is the same type of evidence from which it could conclude that probable cause existed. Thus, the instinctive entry rule is, at best, unnecessary in the scenario where a dog has detected an odor of narcotics before entry.

In the other possible scenario, where a dog has not yet detected an odor of narcotics, the instinctive entry rule is plainly at odds with *Jones* and *Jardines*. As already noted, dog sniffs have special status within the flexible boundaries of *Katz*'s reasonable expectation of privacy test, but the trespassory test of *Jones* affords dog sniffs no special treatment. *See Jardines*, 569 U.S at 10–11 (rejecting an argument under *Caballes* that a trespassory sniff was not a search). Instead, the two-prong trespassory test keeps easy cases easy by requiring a warrant or a valid warrant exception in any instance where (1) a trespass by the government is (2) for the purpose of obtaining information.

Here, there is no question that Bingo's interior sniff of Randall's car was a search under *Jones*. While Randall consented to an exterior sniff, he did not authorize Bingo to enter his car. Thus, Bingo's entry was a trespass. Further, the trespass was for the purpose of obtaining

13

information because it occurred during a drug sniff, which serves no purpose other than to provide information to officers about the presence of narcotics. Because this search occurred without a warrant or consent, it violated Randall's Fourth Amendment rights and the district court erred in denying Randall's motion to suppress.

The dissent suggests that we reach this result by usurping the role of the district court as the finder of fact. The dissent seems to interpret our decision as including a factual finding that Bingo's entry was *not* motivated by instinct. This fundamentally misunderstands today's holding. The Court has not supplanted the district court's inference that Bingo followed the scent of narcotics through the window with its own contrary inference; the holding is that Bingo's motivation, instinctual or otherwise, is irrelevant. The proper inquiry is whether Scheierman had probable cause to believe illegal drugs were in Randall's car before Bingo jumped through the window. Here, the district court made no probable cause determination. Nor could it have determined that probable cause existed based on evidence in the record. Scheierman's testimony supports, and the video shows, that Bingo was eager to conduct the sniff and that he jumped inside the car almost as soon as the sniff began. But neither this Court nor the district court are competent to determine from Bingo's behavior whether he was prompted by a "robust odor" of marijuana (as the dissent postulates), by a generally eager disposition, by having been trained to jump through car windows whenever he is able, or any other reason. Instead, it was necessary for Scheierman, as Bingo's handler and a witness subject to cross-examination, to explain why Bingo's behavior was an objectively reliable indication that narcotics were present. He provided no such testimony and there is no other evidence in the record on which to base a finding of probable cause. *Cf. State v. Howard*, ___ Idaho ___, ___, ___P.3d ___, ___ (2021) ("Without objective evidence bearing on the reliability of [a drug dog's] behavior before his trained alert, we are left with little more than our intuition about the significance of that behavior. Our intuition is not evidence.").

Finally, the State attempts to square *Naranjo* with *Jones* by drawing a distinction between trespasses by law enforcement officers and those by drug dogs. The State contends "where a drug dog instinctively . . . enters a car, it is simply not true that *officers* trespassed . . . ." (Emphasis in original.) The State's distinction is irrelevant under *Jones*. What matters is whether "*[t]he Government* physically occupied private property for the purpose of obtaining information." *Jones*, 565 U.S. at 404 (emphasis added). That is what happened here. Scheierman

14

deployed Bingo as an investigatory tool to obtain information about the contents of Randall's car, and—much like the attachment of the GPS device to the defendant's car in *Jones*—Scheierman's use of the tool was a search because it resulted in trespass against private property.

We recognize that, unlike GPS devices, drug dogs have volition and an intrusion by a drug dog may not be at the specific direction of officers. However, we will not regard drug dogs as highly trained tools of law enforcement when their behavior is consistent with the limitations of the Fourth Amendment, and then regard them as mere dogs when their behavior runs afoul of it. At bottom, law enforcement is wholly responsible for the training and deployment of drug dogs; it is likewise wholly responsible when, as a result of their training and deployment, dogs enter vehicles during exterior sniffs. To the extent the State has argued that an alert by Bingo (whether inside or outside the car) was sufficient to establish probable cause because it was a reliable indication of illegality by a highly trained tool of law enforcement—yet his leap inside the car was nothing more than a dog being a dog—the State's argument is not well taken.

Similarly unpersuasive is the dissent's contention that there is nothing to be gained by applying the exclusionary rule in cases of trespasses by drug dogs. Setting aside that the dissent appears to work backward from its conclusion that exclusion is unjustified to reach its premise that no Fourth Amendment violation occurred, there is no basis to assume that constitutionally compliant dog sniffs are "simply unattainable," as the dissent asserts. If dogs can be trained to seek out substances they have no natural inclination to seek, and then to respond to their presence with specific and predictable behaviors, then surely they can be trained not to jump through car windows in the process. If they cannot, it is not the Fourth Amendment that must yield.

In sum, though an exterior sniff of a car is not a search under *Caballes*, it becomes a search under *Jones* when a drug dog trespasses into the car's interior. Absent a warrant, probable cause, or consent, such a search violates the Fourth Amendment. Because Bingo's entry into Randall's car was a search in violation of the Fourth Amendment, and the government did not establish an exception to the exclusionary rule, we hold that the district court erred in denying Randall's motion to suppress.

## IV. CONCLUSION

15

The district court's denial of the motion to suppress is reversed and Randall's conviction is vacated. Because we vacate Randall's conviction, we need not consider his argument that the sentence imposed by the district court was excessive.

Justice MOELLER, and Justice Pro Tem BURDICK CONCUR.


STEGNER, Justice, concurring.

I concur with the majority's conclusion that the dog Bingo's physical intrusion into Randall's vehicle violated his Fourth Amendment rights. I write separately, however, to note my belief that the United States Supreme Court's Fourth Amendment jurisprudence takes a wrong turn by refusing to classify a dog sniff around the exterior of a vehicle as a search. *See Illinois v. Caballes*, 543 U.S. 405 (2005). I also disagree with the Supreme Court's conclusion that individuals do not have a legitimate expectation of privacy in contraband under the Fourth Amendment to the federal constitution. *See id.* Instead, I would rely on Article 1, section 17 of the Idaho Constitution to find that the use of a drug detection dog constitutes a search because there *is* a legitimate expectation of privacy under these circumstances.

It is well-established that the federal constitution merely provides a floor for protections guaranteed to individuals; state constitutions, however, can and often do provide greater protections against government intrusion. *See Kansas v. Carr*, 577 U.S. 108, 129, 136 S. Ct. 633, 648, 193 L. Ed. 2d 535 (2016) (Sotomayor, J., dissenting) ("The Federal Constitution guarantees only a minimum slate of protections; States can and do provide individual rights above that constitutional floor."); *see also State v. Guzman*, 122 Idaho 981, 987, 842 P.2d 660, 666 (1992) ("It is by now beyond dispute that this Court is free to interpret our state constitution as more protective of the rights of Idaho citizens than the United States Supreme Court's interpretation of the federal constitution.").

Article 1, section 17 of the Idaho Constitution provides:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue without probable cause shown by affidavit, particularly describing the place to be searched and the person or thing to be seized.

IDAHO CONST. art. I, § 17. This Court has previously held that this provision affords greater protections to Idaho citizens than its federal counterpart. *See, e.g.*, *Guzman*, 122 Idaho at 998.

16

842 P.2d at 677. It is my view that using a drug detection dog to conduct an exterior vehicle sniff constitutes a search under Article 1, section 17 of the Idaho Constitution.

To my way of thinking, the use of a drug detection dog is indistinguishable from the use of a thermal imaging device which has been found to be an unconstitutional search. *See Kyllo v. United States*, 533 U.S. 27 (2001). In *Kyllo*, law enforcement used a thermal imaging device to scan a suspect's home for heat signatures associated with lamps commonly used to grow marijuana. *Id.* at 29–30. The United States Supreme Court held that the use of "sense-enhancing technology" to obtain "information regarding the interior of [a] home that could not otherwise have been obtained without physical 'intrusion into a constitutionally protected area,' [] constitutes a search." *Id.* at 34 (quoting *Silverman v. United States*, 365 U.S. 505, 512 (1969)). The Court's holding reflected its belief that an investigatory tool used by law enforcement to obtain information regarding a constitutionally protected area is a search subject to Fourth Amendment protections. *See id.*

It is difficult to square the Supreme Court's decision in *Kyllo* with its subsequent decision in *Illinois v. Caballes*, 543 U.S. 405 (2005). In *Caballes*, an officer pulled a vehicle over for speeding. *Id.* at 406. As that officer was writing a warning ticket for the driver, Caballes, another officer walked his drug detection dog around Caballes' vehicle. *Id.* The dog alerted to the presence of contraband. *Id.* The Supreme Court noted that "conducting a dog sniff would not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner, *unless the dog sniff itself infringed respondent's constitutionally protected interest in privacy*." *Id.* at 408 (italics added). The Supreme Court then concluded that

> the use of a well-trained narcotics-detection dog—one that "does not expose noncontraband items that otherwise would remain hidden from public view,"— during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.

*Id.* at 409 (citation omitted).

The Court next attempted to reconcile its conclusion in *Caballes* with that of *Kyllo* by distinguishing the thermal imaging device's capabilities from a drug detection dog's. *Id.* at 409–10. "Critical to [*Kyllo*] was the fact that the [thermal imaging] device was capable of detecting *lawful activity*." *Id.* (Italics added.) However, the Court continued, "[t]he legitimate expectation

that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car." *Id.* at 410. Because the dog sniff only revealed "the location of a substance that no individual has any right to possess," the Court concluded that the Fourth Amendment was not implicated. *Id.*

I disagree with the Supreme Court's analysis in *Caballes*. I believe that the use of a drug detection dog—an investigatory tool of law enforcement—which is used to obtain information regarding the contents *inside* a vehicle is a search just as the use of a thermal-imaging device to obtain information regarding the contents of a home is a search. *Kyllo*, 553 U.S. at 34. Merely because a drug detection dog can purportedly only smell illegal contraband does not exempt it from complying with the constraints of the Fourth Amendment or Article I, section 17 of the Idaho constitution. At its base, a dog sniff obtains information about the contents of an otherwise constitutionally protected area. *See United States v. Jones*, 565 U.S. 400 (2012) (holding that a vehicle is an "effect" under the Fourth Amendment). A drug-detection dog is used solely for its enhanced sense of smell, like how the thermal imaging device in *Kyllo* was used solely for its enhanced ability to sense heat signatures; both are "tools" and both are "sense-enhancing." *Kyllo*, 533 U.S. at 34. Therefore, I would find that a dog sniff conducted around the exterior of a vehicle is a search under Article 1, section 17 of the Idaho Constitution.

The dissent asserts (wrongly, in my opinion) that "a dog is not a state actor." I disagree. Fourth Amendment jurisprudence makes clear that "private individuals who are acting as government instruments or agents" are similarly prohibited from engaging in unreasonable searches. *United States v. Reed*, 15 F.3d 928, 931 (9th Cir. 1994); *see also Coolidge v. New Hampshire*, 403 U.S. 443, 487, 91 S. Ct. 2022, 2049, 29 L. Ed. 2d 564 (1971).[1] Whether

---

[1] The Ninth Circuit has enunciated a two-part test to determine whether a private individual is acting at the behest of the government: "(1) whether the government knew of and acquiesced in the intrusive conduct; and (2) whether the party performing the search intended to assist law enforcement efforts or further his own ends." *Reed*, 15 F.3d at 931. Although I recognize the unique nature of drug dogs, I nevertheless think this test is instructive in this context. Under this test, a drug-detection dog is undoubtedly a "government instrument" in that it is deployed by law enforcement for a specific investigatory purpose. First, law enforcement officers clearly facilitate the conduct of their drug-detection dogs; indeed, they refer to themselves as the dog's "handler." The handler is anything but a disinterested, neutral party (which is a much greater involvement than mere acquiescence); rather, the handler decides when to deploy his or her dog and the specific method of doing so. Second, the dog clearly performs an exterior (or in this case, interior) sniff of a vehicle in order to "assist law enforcement efforts" to determine whether contraband is present; consequently, the dog is not there to "further [its] own ends." *See id.* Therefore, it cannot be said that a drug-detection dog deployed by law enforcement is not a state actor.

18

categorized as an "investigative tool" or a "private individual acting as a government instrument," drug-detection dogs would not be present during a traffic stop if not for law enforcement initiation. Merely because a drug-detection dog—an extension of the officer's investigative abilities—acts "instinctively," does not mean the purpose of "obtaining information" has been abandoned. Regardless of *who* directed Bingo to enter the vehicle (whether it be by his own instinct or at Trooper Scheierman's direction), information regarding the contents of the vehicle was ultimately elicited.

I also note that the U.S. Supreme Court's determination that individuals cannot possess a legitimate expectation of privacy in contraband is logically unsound. One should not forfeit one's constitutionally guaranteed protections simply by possessing contraband. Even if an individual is in possession of contraband, that person must still be afforded constitutional protections (whether they are derived from the federal constitution or Idaho's). To selectively (and retroactively) apply these protections only to those individuals who "have nothing to hide" simply eliminates the rights of all who benefit from them. To be clear, I do not condone the possession of contraband, but I also cannot condone a legal standard that dispossesses individuals of their constitutionally protected freedom from unreasonable government intrusions merely because they may possess something illegal.

At its root the Supreme Court's rationale may be accurately characterized as the ends justify the means. The fate of Revolutionary War spy Nathan Hale offers an apt analogy: Hale briefly served as a spy for the Continental Army, during which he was captured by British forces. *See Nathan Hale, American Revolutionary War Officer*, ENCYCLOPEDIA BRITANNICA, https://www.britannica.com/biography/Nathan-Hale (last updated Sept. 18, 2021). After apparently being searched by British troops, incriminating documents were found on Hale, and he was swiftly condemned to death for spying. *See id.* Hale was hanged without trial the next day. *Id.* It is precisely this type of unwarranted intrusion from government actors that prompted the Founding Fathers to adopt the Bill of Rights, particularly the Fourth Amendment. Under the Supreme Court's analysis, the search of Hale was perfectly legitimate because he had no lawful basis to possess the documents found on him which were presumably treasonous to the British Crown.

If the illegal nature of an item discovered upon a search offers a post hoc justification for that search, then ordinary citizens possess no Fourth Amendment right to be free from

unreasonable searches at all. Such a justification leaves citizens *not* in possession of contraband without a mechanism to enforce their Fourth Amendment rights and to be free of governmental overreach. In addition, citizens who *are* in possession of contraband never really enjoy Fourth Amendment protections in the first place, since their possession of contraband is itself the justification for government intrusion. I suggest that the Fourth Amendment is not that hollow; if it is, we will no longer be a nation or state functioning under the rule of law. To hold otherwise all but eliminates our citizens' Fourth Amendment protections.

Even though I found it necessary to concur in this way, I agree with the majority's conclusion that Bingo's physical intrusion into Randall's vehicle constituted an illegal search.

BEVAN, Chief Justice, dissenting in part.

I respectfully dissent from Part III.B of the majority opinion, which held that Bingo's interior sniff was an unconstitutional search.

### A. The purpose of the exclusionary rule.

Given my divergent view of the outcome that we should reach in this case, I begin with a discussion of the paradigm through which I view the issue before us. While the question presented is whether the Fourth Amendment was violated by the officer's conduct here, to get to that point the Court must also walk over, through or around the question of whether exclusion of this evidence serves any salutary purpose. The United States Supreme Court has noted that when considering whether to exclude evidence as the result of an alleged constitutional violation, the purposes behind the "prudential doctrine" of the exclusionary rule must be considered. *Davis v. United States*, 564 U.S. 229, 236 (2011).

> Exclusion is "not a personal constitutional right," nor is it designed to "redress the injury" occasioned by an unconstitutional search. The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations. Our cases have thus limited the rule's operation to situations in which this purpose is "thought most efficaciously served." Where suppression fails to yield "appreciable deterrence," exclusion is "clearly . . . unwarranted."

*Id*. at 236–37 (citations omitted).

This Court has acknowledged this principle, noting that there are "recognized circumstances where the exclusionary rule need not apply. . . ." *State v. Maxim*, 165 Idaho 901, 905, 454 P.3d 543, 547 (2019). We also reiterated that the purpose of the exclusionary rule is to

20

deter—to compel respect for the constitutional guarantee in the only effectively available way—by removing the incentive to disregard it. *Id*.

"In time . . . [the United States Supreme Court] came to acknowledge the exclusionary rule for what it undoubtedly is—a 'judicially created remedy' of [that] Court's own making." *Davis*, 564 U.S. at 238 (citing *United States v. Calandra*, 414 U.S. 338, 348 (1974)). The Court "abandoned the old, 'reflexive' application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits." *Id*. In a line of cases beginning with *United States v. Leon,* 468 U.S. 897 (1984), the Court recalibrated its "cost-benefit analysis in exclusion cases to focus the inquiry on the " 'flagrancy of the police misconduct' " at issue." *Id*. (quoting *Leon*, 468 U.S. at 911). It is the flagrancy of the *police misconduct*" (of which there is none here) where I focus my attention in reaching a result inverse to that of the majority.

### B. The drug dog's instinctive actions did not violate the Fourth Amendment.

Viewed through this paradigm, I conclude there was absolutely no police misconduct in Bingo's instinctive entry into Randall's rental car. The district court found the search here to be valid based upon Idaho precedent that held the instinctive actions of trained drug dogs do not expand the scope of an otherwise legal dog sniff to an impermissible search. *See State v. Naranjo*, 159 Idaho 258, 260, 359 P.3d 1055, 1057 (Ct. App. 2015)[1]. The Court of Appeals likewise applied this precedent to uphold the district court's result in this case.

The majority, however, rejected this reasoning (I recognize Court of Appeals decisions are not binding on this Court) and fashioned an alternate conclusion by relying on *United States v. Jones* and *Florida v. Jardines*. The majority essentially held (now in two cases released today, *see State v. Howard*, ___ Idaho ____, ___ P.3d ____ (2021)), that the threshold of a vehicle's door or window is sacrosanct, like the threshold of a home, and that any intrusion into that space by a trained drug dog, whether fleeting, like in *Naranjo* or *Howard*, or extended for some seconds, like the facts here, is an affront to the constitutional rights of the vehicle's driver.

The clear distinction in both *United States v. Jones* and *Florida v. Jardines*, is that in both cases it was the *officer* who intentionally trespassed to gather information, not the non-state actor drug dog. In *Jones*, the Supreme Court of the United States held that an officer's placement of a

---

[1]  As the district judge who was affirmed in *Naranjo*, my view regarding the issue before the Court is likely not surprising.

tracking device on a defendant's vehicle was a search within the meaning of the Fourth Amendment. 565 U.S. at 406–08. In *Jardines*, the Court held that an officer violated the defendant's Fourth Amendment right when he took "a trained police dog to explore the area around the home in hopes of discovering incriminating evidence." 569 U.S. at 9. Conversely, here, as found by the district court, the trooper did nothing wrong; Bingo acted instinctively—or "independently," to quote the district court, without facilitation, prompting, or provocation from the officer when he jumped into Randall's vehicle. Notwithstanding the majority's unspoken view that a trained canine is like a computer or a human-operated drone, a dog is a dog, and takes certain actions instinctively. When the dog does so without the direction of the officer, that instinctual action cannot be attributed to its officer-handler, and the purposes of the exclusionary rule are not served by suppressing the evidence found in such circumstances. The key inquiry is whether the officer was a participant in the trespass – that is, whether the dog's entry was instinctual or facilitated by the police.

I recognize and highly value the Fourth Amendment's protection of the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." But I diverge from the notion that a vehicle's threshold should be elevated to the level of a home for purposes of our analysis involving the conduct of the dog (Bingo) under the paradigm set forth above for the exclusionary rule. Cars are different. *E.g. Carroll v. United States,* 267 U.S. 132, 153 (1925) (a "necessary difference" exists between searching "a store, dwelling house or other structure" and searching "a ship, motor boat, wagon or automobile" because a "vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought."). Dogs are different. *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (quoting *United States v. Place*, 462 U.S. 696, 707 1983)) (a canine sniff by a well-trained narcotics-detection dog is "*sui generis* " [Latin: "of its own kind"] because it "discloses only the presence or absence of narcotics, a contraband item."). A dog search outside or inside a vehicle, where the dog acts of its own volition, does not implicate the Fourth Amendment because the dog is not rummaging through the driver's personal effects or violating any privacy interest the driver has to other private contents. The dog is there to sniff-out and alert that drugs are present – and nothing more. As such, the Fourth Amendment is not implicated in these circumstances. As the Supreme Court noted in *Illinois v. Caballes*, a vehicle's driver has *no* privacy interest in possessing illegal drugs that society is willing to recognize. When a drug dog follows its training

and roots-out illegal drugs as its sole purpose, without exposing other private information, there is no Fourth Amendment violation:

> [T]he use of a well-trained narcotics-detection dog—one that does not expose noncontraband items that otherwise would remain hidden from public view during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement.
>
> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Critical to that decision was the fact that the device was capable of detecting lawful activity—in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." *Id.,* at 38, 121 S.Ct. 2038. *The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.*

543 U.S. at 409–10 (emphasis added) (some citations and internal punctuation changed).

The fact that the drug dog instinctively entered the vehicle does not alter the analysis. "A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment." Thus, there was no Fourth Amendment violation in this case.

Beyond that, getting back to my original premise, I question what the majority wishes to deter through its ruling today. Does it wish to inhibit trained canines from leading their handlers to a vehicle and leaping through an already open window of their own volition? Does the Court wish to require dog trainers to ensure that such a canine may not follow a scent through an open window into an area where the odor is strongest to offer its alert? Is the goal to require officers who train such animals to train them to only alert while walking near, but not next to, a vehicle – at a safe enough distance away from an open window to make sure the dog cannot put its paws and nose through a window for a better sniff? These goals are simply unattainable as a matter of deterrence.

First, a dog is not a state actor. A dog is not able to be deterred by its reading our latest case or going to continuing education. It has no ill will or improper motivation that can be trained-away by learning the latest nuance of constitutional law. It simply provides an alert when it smells narcotics in order to receive a reward. Training an officer to prohibit the dog from acting by instinct is similarly illogical. One of Merriam-Webster's definitions of "instinct" is a "largely inheritable and unalterable tendency of an organism to make a complex and specific response to environmental stimuli *without involving reason*," or "behavior that is mediated by reactions below the conscious level." (Emphasis added). That is the point. Instinctive responses are a matter of a reaction below the conscious level. A trained canine will instinctively follow a specified odor, like Bingo did here, by almost dragging his handler to the vehicle where the dog jumped into the window pursuing the probably robust odor that 65 pounds of marijuana would produce. The fact that such dogs' reactions in these circumstances are instinctual in response to the stimuli of narcotics–which is the dog's only purpose in being there–supports the conclusion reached by the district court that Bingo's actions were involuntary and unaided by his handler, Trooper Scheierman.

Second, the vast majority of appellate courts to consider this issue have recognized that dogs act instinctively and therefore do not violate the Fourth Amendment, even when entering a vehicle. *See*, *e.g.*, *United States v. Mahan*, 2021 WL 1341038, at *6 (D. Idaho Apr. 9, 2021) (citing federal cases). In fact, I have yet to locate an appellate court that has held what our Court holds today. By so ruling, the Court disregards the difference between a living, breathing "tool" that is not a programmed robot, but that acts on its training and its instinct to root-out the odor it is seeking, and other law enforcement tools, such as a GPS or a thermal imaging device, that always require human direction or facilitation.

The facts of the Idaho Court of Appeals decision in *State v. Naranjo* are apropos. There, an officer ran his canine around the exterior of Naranjo's vehicle during a traffic stop. 159 Idaho at 259, 359 P.3d at 1056. When the dog reached Naranjo's open driver's side window, the dog spontaneously moved his head up to the open window, put his nose inside, and immediately alerted. *Id*. The Court of Appeals rejected Naranjo's efforts to suppress the evidence found in the vehicle, holding that the dog's instinctual sniff did not constitute a search because it was not facilitated by the officer. *Id*. at 261, 359 P.3d at 1058.

24

In reaching this conclusion, the Court of Appeals cited to a line of federal cases that have held absent police misconduct, the instinctive actions of trained drug dogs do not expand the scope of an otherwise legal dog sniff to an impermissible search. *United States v. Sharp*, 689 F.3d 616, 620 (6th Cir. 2012) (no search when dog jumped through open window without facilitation by police); *United States v. Pierce*, 622 F.3d 209, 214–15 (3d Cir. 2010) (no search when, without facilitation by police, dog entered car door opened by defendant); *United States v. Lyons*, 486 F.3d 367, 373–74 (8th Cir. 2007) (no search when, without facilitation by police, dog's head entered window opened by passenger); *United States v. Stone*, 866 F.2d 359, 364 (10th Cir. 1989) (no search when dog jumped in hatchback that was not opened to permit dog to enter and police did not encourage entry); *United States v. Hutchinson*, 471 F. Supp.2d 497, 510–11 (M.D. Pa. 2007) (no search where dog entered car window that police did not open and police did not encourage entry).

By contrast, when a drug-detecting dog enters a car because it was provoked or prompted to do so by officers, or through misconduct serving no purpose but to facilitate a sniff on the interior of the vehicle, the Fourth Amendment is violated. *United States v. Winningham*, 140 F.3d 1328, 1331 (10th Cir. 1998) (search occurred where police opened van door, unleashed dog as he neared the door, and the dog entered the van). As the North Carolina Supreme Court summarized:

> If a police dog is acting without assistance, facilitation, or other intentional action by its handler (in the words of *Sharp*, [689 F.3d at 620] acting "instinctively"), it cannot be said that a State or governmental actor intends to do anything. In such a case, the dog is simply being a dog. If, however, police misconduct is present, or if the dog is acting at the direction or guidance of its handler, then it can be readily inferred from the dog's action that there is an intent to find something or to obtain information. *See Winningham*, 140 F.3d at 1330–31 (invalidating a search on such grounds).

*State v. Miller*, 766 S.E.2d 289, 296 (N.C. 2014).

The majority rejected this precedent in favor of its singular determination that the officer somehow trespassed into the vehicle using his canine – and thus the instinctive entry rule cannot be reconciled with the Fourth Amendment. Focusing on the alleged conflict between the instinctive entry rule and the probable cause requirement, the majority finds that "the instinctive entry rule removes the focus from where it must be—the circumstances known to an officer at the time of a search—and focuses what motivated the behavior of the officer's dog." However, what motivated the behavior of the officer's dog is key because a search only occurs under *Jones*

25

when the entry is done "for the purpose of obtaining information." A dog's instinctual, unaided response is distinguishable from an officer's intentional action to gain information. Thus, the critical inquiry remains whether the dog's entry was instinctual or facilitated by an officer – not whether the officer had probable cause before the dog crossed the now inviolable border of the car's door or windowsill.

The majority voices concern that by turning the inquiry away from whether the officer had probable cause, the rule risks courts drawing their own post hoc conclusions about the significance of a drug dog's pre-entry behavior. But this is precisely what trial courts are supposed to do when applying the facts to the law in these circumstances. Courts routinely rely on handler testimony to determine whether a drug dog acted instinctively or was trained, encouraged, or guided into a vehicle. *Pier v. State*, 421 P.3d 565, 586 (Wyo. 2018) (drug dog's handler is uniquely qualified to interpret that dog's behaviors during a sniff); *United States v. Ludwig*, 10 F.3d 1523, 1528 (10th Cir. 1993) (giving greater weight to handler testimony to resolve discrepancy between handler and non-handler testimony). This is a matter of witness credibility. *United States v. Howard*, 621 F.3d 433, 449 (6th Cir. 2010), *cert. denied*, 562 U.S. 1278 (2011) (credibility of dog's alert turns almost exclusively on the credibility of the dog's handler's testimony). These questions are left to the able trial courts of this state. *Reed v. Reed*, 157 Idaho 705, 710, 339 P.3d 1109, 1114 (2014) ("It is the responsibility of the trial court to judge the credibility of witnesses and weigh conflicting evidence.").

At the motion to suppress hearing, Trooper Scheierman testified:

Q. And upon retrieving or removing K-9 Bingo out of your vehicle, how did you go about conducting the sniff?

A. Put Bingo on leash, and he walked me, basically, up to the car. I was supposed to walk him, but he walked me because – but, yeah, he went to the – and then went to the car, the suspect car.

Q. And what did he do when he got to the vehicle?

A. He went to the driver's side of the vehicle. He put his front paws up onto the front driver's side window, which was open, and I noticed Bingo paused briefly as he was sniffing, and then propelled himself inside of that open window.

Once inside the vehicle, I watched Bingo go into the backseat. At that point he began intense, closed-mouth, sniffing pattern on the back seat, eventually

sticking his head into the crack where the back rest and the seat meet there, and then gave his final indication by laying down on the back seat there.

Trooper Scheierman later testified that Bingo kept trying to get back into the vehicle, at one point successfully doing so:

> [B]ecause he's already been – he's already gave his final response once to the source of the odor, so he is thinking, go back to the source, and I'm going to get my toy. So he is, like, I already know where it is. I'm going back in to where I smelled it. That's why he continues to try and go back into the vehicle.

This testimony supports the district court's factual finding that "Trooper Scheierman's drug dog made *independent* entry into the Defendant's car because the dog detected an odor emanating from the vehicle." (Emphasis added). Such a conclusion was based on Trooper Scheierman's testimony and the district court's view of the dash-cam video. It was not based on the court's own post-hoc interpretation of Bingo's behavior. "[T]he appellate court cannot reweigh the evidence, judge the credibility of the witnesses, or substitute its view of the facts for that of the trial court." *Wagner v. Wagner*, 160 Idaho 294, 297, 371 P.3d 807, 810 (2016). The majority has done just that by viewing the dash cam video itself and then supplanting the district court's conclusions with factual conclusions of its own.

The district court found that Trooper Scheierman "did nothing to initiate the dog's entry into the vehicle" and that "the drug dog made independent entry into the [d]efendant's car because the dog detected an odor emanating from the vehicle." The majority implicitly holds that these findings are clearly erroneous. The evidence is exactly to the contrary. As the district court found, and as Trooper Scheierman testified, Bingo led Trooper Scheierman to the driver's side window left open by Randall, not the other way around. The dash-cam video clearly shows Bingo leading Trooper Scheierman, walking in front of Trooper Scheierman, directly to the driver's side window of the car, and jumping in after sniffing momentarily. Trooper Scheierman testified that Bingo is trained to track and indicate passively on the source of the odor of narcotics. He testified that when Bingo was at the window, Bingo "paused briefly as he was sniffing, and then propelled himself inside of that open window," after which Bingo immediately went into the back seat and indicated the presence of narcotics. Though it is possible that Bingo entered the car for some other reason, it is eminently reasonable for the district court to conclude that a drug dog trained to follow the scent of narcotics was doing just that when he sniffed at the open window and immediately jumped into the car without any command or prompting from

27

Trooper Scheierman, and then alerted to narcotics. The district court's findings are thus supported by substantial and competent evidence.

The majority's concern that a district court could draw its own "post hoc conclusions," negates the district court's ultimate obligation to find facts and apply those facts to its legal conclusions. I have expressed concerns with this Court making its own findings before. *See State v. Farrell-Quigle*, 167 Idaho 773, 788–91, 477 P.3d 208, 223–26 (2020) (Bevan, J., dissenting). These concerns rear their head once again here.

Ultimately, I do not agree with the majority's refusal to consider the difference between an officer's intentional conduct and a dog's instinctual response when evaluating whether a search occurred. Our Court of Appeals got it right when it held:

> When a drug dog follows a scent into a vehicle's interior, it is not a search under the Fourth Amendment if the dog's actions were instinctual and not encouraged or facilitated by the police. A dog's entry into a vehicle is instinctive when the entry occurs without assistance, facilitation, or other intentional action by the dog's handler. This analysis does not turn on whether the officer intended for the dog to enter the vehicle; instead it turns on objective facts.

*State v. Randall*, No. 46893, 2020 WL 4691650, at *7 (Idaho Ct. App. Aug. 13, 2020) (citations omitted).

In addition, although the intrusion was more significant in this case because Trooper Scheierman lifted Bingo into the car, his testimony makes it clear that he only did so to prevent Bingo from injuring himself or Randall's vehicle, and his efforts only came after Bingo had independently placed his paws on the open front driver's side window and jumped half-way into the vehicle. Trooper Scheierman did not do anything to initiate the dog's entry in the vehicle. "[T]he Fourth Amendment addresses "misuse of power," not the accidental effects of otherwise lawful government conduct." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) (quoting *Byars v. United States*, 273 U.S. 28, 33 (1927)).

I would harken back to my initial comments about the paradigm through which I view our review in this case. In that regard, the United States Supreme Court stated the following:

> The basic insight of the *Leon* line of cases is that the deterrence benefits of exclusion "var[y] with the culpability of the law enforcement conduct" at issue. When the police exhibit "deliberate," "reckless," or "grossly negligent" disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. But when the police act with an objectively "reasonable good-faith belief" that their conduct is lawful, or when

28

their conduct involves only simple, "isolated" negligence, the " 'deterrence rationale loses much of its force,' " and exclusion cannot "pay its way. . . ."

*Davis*, 564 U.S. at 238 (citing *Leon*, 468 U.S. at 919) (other citations omitted).

While I recognize that Idaho has rejected *Leon's* good faith exception to the exclusionary rule under the Idaho Constitution*, see State v. Guzman,* 122 Idaho 981, 984–85, 842 P.2d 660, 663–64 (1992), we are bound by the obligation which underpins the exclusionary rule – to take such steps only when necessary to deter deliberate, reckless or grossly negligent conduct by police officers. Violating the sanctity of the home or an individual's legitimate expectation of privacy warrants such a result; a drug dog's voluntary entry into a car while following a scent from outside does not. Trooper Scheierman did nothing wrong here; the Court's decision offers little ground for future deterrence and neglects to address the questions I posed above. As the text of the Amendment makes clear, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.' " *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The result the Court reaches today is unreasonable, and ignores the following admonition from the United States Supreme Court about what is to be gained when ruling that a constitutional violation warrants application of the exclusionary rule:

> Real deterrent value is a necessary condition for exclusion, but it is not a sufficient one. The analysis must also account for the substantial social costs generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment. Our cases hold that society must swallow this bitter pill when necessary, but only as a last resort. For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs.

*Davis*, 564 U.S. at 237 (internal quotations and citations omitted).

Based on these principles, the vast majority of appellate courts to consider this issue in our nation, and the application of those principles to the facts found by the district court, I would affirm that court's decision and deny Randall's motion to suppress.

29