# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48119

| | | |
|---|---|---|
| STATE OF IDAHO, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | Boise, November 2022 Term |
| | ) | |
| v. | ) | Opinion filed: March 20, 2023 |
| | ) | |
| KIRBY ANTHONY DORFF, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant. | ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Elmore County. James S. Cawthon, District Judge.

The judgment of conviction is <u>vacated</u>, the district court's denial of the motion to suppress is <u>reversed</u>, and this case is <u>remanded</u>.

Eric Don Fredericksen, State Appellate Public Defender, Boise, for Appellant. Sally Cooley argued.

Raúl R. Labrador, Idaho Attorney General, Boise, for Respondent. John C. McKinney argued.

_____

BRODY, Justice.

Kirby Dorff appeals from the denial of his motion to suppress evidence obtained after a police drug-sniffing dog jumped onto the exterior surface of his vehicle. Dorff argues that the dog's contact with his vehicle was a trespass, and therefore, an unlawful "search" under the common law trespassory test as articulated in *United States v. Jones*, 565 U.S. 400 (2012)—and applied by this Court in *State v. Howard*, 169 Idaho 379, 496 P.3d 865 (2021) and *State v. Randall*, 169 Idaho 358, 496 P.3d 844 (2021), where we held that a drug dog's entry *into* a vehicle is a "search" under the Fourth Amendment. For the reasons discussed below, a "search" occurs when a drug dog trespasses against the exterior of a vehicle during a "free air" sniff if its physical contact with the vehicle amounts to "intermeddling" at common law. In this case, a drug dog intermeddled with Dorff's vehicle when it jumped onto the driver side door and window, planted two of its paws, and sniffed the vehicle's upper seams. Accordingly, law enforcement conducted a warrantless and

1

unlawful "search" of Dorff's vehicle by way of its drug dog. The denial of Dorff's motion to suppress is reversed, his conviction is vacated, and this case is remanded to the district court for further proceedings consistent with this opinion.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

On a night in August 2019, a patrol officer from the Mountain Home Police Department initiated a traffic stop on a vehicle. The patrol officer reported witnessing the driver "make an improper turn," "cross three lanes of traffic and then fail to use [his] turn signal." Two men were in the vehicle: Kirby Dorff, the driver, and Mitchell Hall, a passenger. After the patrol officer stopped the vehicle in a grocery store parking lot, Dorff told the officer that he did not have a valid driver's license or proof of insurance in the vehicle. During the time the patrol officer was speaking with Dorff and Hall, a K-9 officer arrived on scene with his drug dog, Nero.

The K-9 officer circled Dorff's vehicle twice with Nero. Nero never entered the interior compartment of the vehicle. However, as Nero circled the vehicle, Nero directed his nose close to the vehicle's seams (nearly touching the vehicle in many instances); entered the wheel well areas with his snout; and reached for the vehicle's undercarriage with the same. On Nero's second pass, body-camera footage from the on-scene officers shows Nero made two potential contacts, and one explicit contact, with the vehicle's exterior surface: first, on the rear passenger side of the vehicle (briefly as he jumped up); second, on the front passenger side of the vehicle (again, briefly as he jumped up); and third, on the front driver side of the vehicle—this time planting his front paws to stand up on the door and window as he sniffed the vehicle's upper seams. During this time, the K-9 officer made upward gestures, purportedly "[p]resenting areas for [Nero] to sniff." The K-9 officer later testified that Nero alerted during his explicit contact with Dorff's vehicle, i.e., after Nero stood up and put his front paws on the front driver side door and window.

Following Nero's alert, on-scene police officers searched Dorff's vehicle. In it, they found a pill bottle, folded papers, and a baggie—all containing white residue that later tested positive for methamphetamine. The officers also found "[a] purple container filled with a green leafy residue" in the trunk. The officers then arrested both Dorff and Hall for felony possession of a controlled substance. While searching Dorff incident to his arrest, the officers found a motel room key in his pocket. Hall then told the officers that Dorff "had shown him a bag containing an ounce of methamphetamine" in their shared room at that same motel. The officers later obtained and executed a search warrant on the motel room, where they discovered a bag containing nineteen

2

grams of methamphetamine, and an assortment of drug paraphernalia. From this, the State brought three charges against Dorff: possession of methamphetamine with intent to deliver, possession of methamphetamine, and possession of drug paraphernalia.

Dorff moved to suppress the evidence discovered in his vehicle, and the shared motel room as the fruit of an unlawful search under the Fourth Amendment. Dorff offered two arguments for why suppression was appropriate: (1) Nero's "trespass" onto Dorff's vehicle constituted a warrantless "search" without probable cause under the Fourth Amendment; and (2) Nero's sniff was improperly conducted, thus, it never established probable cause to search the vehicle. The State filed a memorandum in opposition to Dorff's motion and a hearing was held.

At the hearing, the district court dealt with Dorff's two arguments separately. The district court first addressed Dorff's "trespass" argument, and admitted two videos from the on-scene officers' body cameras that provided two different angles of Nero's sniff. The district court reviewed the videos numerous times. Afterwards, the district court heard arguments from both parties over whether Nero "trespassed" against the vehicle for the purpose of obtaining information, i.e., whether a Fourth Amendment "search" occurred under the property-based test articulated in *United States v. Jones*, 565 U.S. 400 (2013). The district court ruled from the bench, and found—based on the two videos alone—that Nero "place[d]" his "paws" on Dorff's vehicle "three" times (across the rear passenger side, the front passenger side, and the driver side) for a "very, very brief period of time[.]" The district court then applied its findings to conclude that, among other things, Nero's contacts with the vehicle did not amount to "intermeddling"—i.e., did not amount to trespass to chattel at common law. Thus, there was no "search" because Nero did not "trespass" against Dorff's vehicle.

After this ruling, the district court next addressed Dorff's "invalid alert" argument. The district court heard competing testimony from the K-9 officer (Nero's handler), and Dorff's expert witness on drug dogs, Andre Falco Jimenez, on whether the manner and technique of Nero's sniff was reliable enough to provide a valid alert to the presence of narcotics. Notwithstanding the expert's testimony that Nero never exhibited a reliable alert, the district court ultimately rejected Dorff's challenge to Nero's sniff as invalid—a ruling that Dorff does not challenge on appeal to this Court. After reaching these conclusions, the district court denied Dorff's motion to suppress the evidence discovered in his vehicle and the shared motel room.

3

Dorff entered a conditional guilty plea to possession of a controlled substance with intent to deliver, while preserving his right to appeal the denial of his motion to suppress. The district court sentenced Dorff to a term of not less than two years but not to exceed seven years, suspended the sentence, and placed Dorff on probation for five years. Dorff timely appealed to this Court.

## II.     STANDARD OF REVIEW

We apply a bifurcated standard of review when reviewing a denied motion to suppress. *State v. Howard*, 169 Idaho 379, 381, 496 P.3d 865, 867 (2021). This Court accepts "the trial court's findings of fact unless they are clearly erroneous" but freely reviews "the trial court's application of constitutional principles to the facts found." *Id.* (quoting *State v. Danney*, 153 Idaho 405, 408, 283 P.3d 722, 725 (2012)).

However, we will not apply the clearly erroneous standard to factual findings in "the unusual situation where this Court has exactly the same evidence before it as was considered by the district court[.]" *State v. Andersen*, 164 Idaho 309, 312, 429 P.3d 850, 853 (2018) (alteration added). In such instance, we do not extend the usual deference to the district court's findings. *Id*. Instead, we "freely review the evidence and weigh the evidence in the same manner as the trial court would do." *State v. Lankford*, 162 Idaho 477, 492, 399 P.3d 804, 819 (2017).

Here, we have exactly the same evidence as the district court did when it ruled on Dorff's argument that Nero "trespassed" against his vehicle for the purpose of obtaining information. At the suppression hearing, the district court's findings and ruling on this issue were based solely on the two body-cam videos—the same videos before this Court on appeal. Moreover, all testimony offered at the hearing was received *after* the district court's findings and ruling on this issue—and related only to Dorff's "invalid alert" argument. Thus, in this unusual and limited circumstance, we freely review and weigh the video evidence in addressing Dorff's appeal.

## III.     ANALYSIS

Dorff argues that Nero's physical intrusions against the exterior surface of Dorff's vehicle constituted a common law "trespass" for the purpose of obtaining information. In other words, Dorff contends that law enforcement, through Nero as its agent, conducted a warrantless "search" of his vehicle under the property-based Fourth Amendment test as recognized in *United States v. Jones*, 565 U.S. 400, 404–05 (2012)—and our recent decisions in *State v. Randall*, 169 Idaho 358, 370, 496 P.3d 844, 856 (2021) and *State v. Howard*, 169 Idaho 379, 382, 496 P.3d 865, 868 (2021) where we held that intrusions by drug dogs, to any degree, into the *interior* space of a vehicle

4

during a drug sniff, without consent, is a "search" under the Fourth Amendment. Thus, Dorff's appeal—which centers on a drug dog's "trespass" against the *exterior* of a vehicle during its "free air" sniff—presents a question of first impression.

To answer this question, we begin with the text of the Fourth Amendment, which provides in relevant part, "[t]he right of the people to be secure in their persons, houses, papers, *and effects*, against unreasonable searches and seizures, shall not be violated." U.S. CONST. amend. IV (emphasis added). This text "reflects [the Fourth Amendment's] close connection to property," and consistent with this understanding, Fourth Amendment jurisprudence was traditionally "tied to common-law trespass[.]" *Jones*, 565 U.S. at 405 (alteration added). Indeed, "for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates." *Id*. It was not until the second half of the 20th century that the United States Supreme Court "*added to*"—without replacing—the "common-law trespassory test[,]" with the "reasonable expectation of privacy" test in *Katz v. United States*, 389 U.S. 347, 351 (1967). *Jones*, 565 U.S. at 409 (emphasis in original).

Although neither test is exclusive or necessary to determining whether a "search" occurred within the meaning of the Fourth Amendment, *Jones*, 565 U.S. at 411, the traditional property-based test endures as a "baseline" of protection against governmental searches as it existed when the Fourth Amendment was adopted. *Florida v. Jardines*, 569 U.S. 1, 11 (2013); *Jones*, 565 U.S. at 406 n.3 ("Whatever new methods of investigation may be devised, our task, *at a minimum,* is to decide whether the action in question would have constituted a 'search' within the original meaning of the Fourth Amendment." (emphasis in original)).

Like our decisions in *Randall*, 169 Idaho at 368, 496 P.3d at 854, and *Howard*, 169 Idaho at 382, 496 P.3d at 868, this case is *only* concerned with the property-based test—not the "reasonable expectation of privacy" test under *Katz*. Under the property-based test, "it is beyond dispute that a vehicle is an 'effect' as that term is used in the [Fourth] Amendment." *Jones*, 565 U.S. at 404 (alteration added). Importantly, when the property-based test is *applied*, there is no room to carve out portions of an "effect" (e.g., the exterior surface of a vehicle versus its interior space) as unworthy of protection by superimposing the "reasonable expectation of privacy" nomenclature from *Katz*. A drug dog's sniff of the free air—surrounding a vehicle, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005), or surrounding luggage, *United States v. Place*, 462 U.S. 696, 707 (1983)—may have a "special status" as not a "search" within the "flexible boundaries of

5

*Katz*'s reasonable expectation of privacy test, but the trespassory test of *Jones* affords dog sniffs no special treatment[,]" *Randall*, 169 Idaho at 368, 496 P.3d at 854. Thus, as our starting point, the entire vehicle or "effect" is a "constitutionally protected area"—to the extent a defendant has interests or rights in it. *See Jones*, 565 U.S. at 404 n.2 (noting that although the vehicle was registered to the defendant's wife, it was undisputed that the defendant was the exclusive driver, thus, if "he was not the owner he had at least the property rights of a bailee").

Relatedly, to have standing to claim the protection of the Fourth Amendment, a defendant must have *either* "a privacy interest[,]" *Howard*, 169 Idaho at 385, 496 P.3d at 871 (citing *State v. Mann*, 162 Idaho 36, 41, 394 P.3d 79, 84 (2017))—*or* a "proprietary interest" (i.e., property interest), *State v. Ryan*, 117 Idaho 504, 506, 788 P.2d 1327, 1329 (1990) (quoting *State v. Haworth*, 106 Idaho 405, 407 n.2, 679 P.2d 1123, 1125 n.2 (1984))—in the place searched, *Howard*, 169 Idaho at 385, 496 P.3d at 871. If the State does not challenge a defendant's Fourth Amendment standing before the trial court, the issue is waived. *Howard*, 169 Idaho at 385, 496 P.3d at 871. Here, the State never challenged Dorff's standing as it relates to the vehicle, and "[p]ossession of personal property is prima facie evidence of ownership[,]" *Hare v. Young*, 26 Idaho 691, 702, 146 P. 107, 109 (1915) (citations omitted and alterations added). Accordingly, we assume Dorff's property interests in the vehicle, as its driver and possessor, are coextensive with that of an owner.

With our inquiry now properly focused, whether a Fourth Amendment "search" occurred during Nero's "free air" sniff of Dorff's vehicle will depend on whether Nero (1) "trespass[ed]" against Dorff's vehicle (2) for "the purpose of obtaining information" about, or related to, the vehicle. *Jones*, 565 U.S. at 404 (alterations added). A "[t]respass alone does not qualify" as a "search"—"there must be conjoined with that . . . an attempt to find something or to obtain information." *Id*. at 408 n.5. It is "self-evident[]" that when the State deploys a drug dog to conduct a free air sniff of a vehicle, that activity is "conducted for the purpose of obtaining information[.]" *Howard*, 169 Idaho at 382, 496 P.3d at 868. Thus, in this case, there is no dispute that if Nero trespassed against Dorff's vehicle—he did so in an attempt to find something or to obtain information (e.g., substances he was purportedly trained to locate: methamphetamine, heroin, cocaine, and marijuana). Accordingly, whether a Fourth Amendment "search" occurred here turns on whether Nero "trespassed" against Dorff's vehicle under common law trespass to chattel, i.e., trespass to personal property. For the reasons below, we conclude that Nero trespassed.

6

As noted above, the traditional property-based trespass test applies "an 18th-century guarantee against unreasonable searches, which . . . must provide *at a minimum* the degree of protection it afforded when [the Fourth Amendment] was adopted." *Jones*, 565 U.S. at 411 (emphasis in original and alteration added); *Cf. New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2132 (2022) ("Although [the Second Amendment's] meaning is fixed according to the understandings of those who ratified it, the Constitution can, and must, apply to circumstances beyond those the Founders specifically anticipated." (alteration added)). However, "[p]roperty interests, of course, are not created by the [United States] Constitution." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (alteration added). And "[t]here is no federal general common law[,]" *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938), of "trespass" that can answer what "degree" of protection is afforded to "effects" under the Fourth Amendment.

Instead, state law has traditionally created, and defined, property interests. *See Maresh v. State, Dep't of Health & Welfare ex rel. Caballero*, 132 Idaho 221, 226, 970 P.2d 14, 19 (1998); *see, e.g.*, *Garrett v. Soucie*, 46 Idaho 289, 292–93, 267 P. 1078, 1078 (1928) (illustrating that state law governed the foreclosure of a "chattel mortgage" covering property interests in certain "crops of hay and grain"); *State v. Dunlap*, 28 Idaho 784, 801, 156 P. 1141, 1145 (1916) (explaining that shares of corporate stock are "personal property" which "descend" and are "transferred" according to state law). Indeed, we have already explained in applying the *Jones* test that "[s]tate law . . . determines which sticks are in a person's bundle, and therefore defining property itself is a state-law exercise." (alteration added and citation omitted)). *State v. Rebo*, 168 Idaho 234, 240–41, 428 P.3d 569, 575–76 (2021). Thus, whether governmental conduct amounts to a "trespass" against an "effect" at common law necessarily intersects with state law surrounding the Fourth Amendment's adoption.

From Idaho's founding as a territory in 1863, to its achievement of statehood in 1890, and through to today, the common law of England—along with its traditional principles of property law—have been the general common law of Idaho. *See* 1863 Idaho Terr. Laws 527 ("The common law of England so far as the same is not inconsistent with the provisions of the constitution and the laws of the United States, the organic act and laws of this territory, be the law of this land in this territory."); Idaho Rev. Stat. § 18 (1887) ("The common law of England, so far as it is not repugnant to, or inconsistent with the constitution or laws of the United States, in all cases not provided for in these Revised Statutes, is the rule of decision in all the courts of this territory.");

7

IDAHO CONST. Art. XXI, § 2 ("All laws now in force in the territory of Idaho which are not repugnant to this Constitution shall remain in force until they expire by their own limitation or be altered or repealed by the legislature."); Idaho Rev. Code § 18 (1909); I.C. § 70-116 (2023).

Obviously, Idaho—and its general common law—did not exist when the Fourth Amendment was adopted in 1791. But "[s]trictly speaking," Idaho is "bound to respect" the Fourth Amendment because of the Fourteenth Amendment—not the Fourth. *Cf. Bruen*, 142 S. Ct. at 2137 (noting the same for New York and the Second Amendment). With this in mind, England's common law surrounding 1791 certainly commences our inquiry—but the overlay of *state*-focused common law "trespass" into the property-based Fourth Amendment test forces our analysis closer to the common law surrounding 1868, when the Fourteenth Amendment was adopted—and Idaho in fact existed. Importantly, "courts must be careful when assessing evidence concerning English common law rights[,]" because "[t]he common law, of course, developed over time." *Bruen*, 142 S. Ct. at 2136. Thus, "English common-law practices and understandings at any given time in history cannot be indiscriminately attributed to the Framers of our own Constitution." *Id*. This holds true for the common law of trespass to chattel in Idaho.

To begin, William Blackstone, a justice of the Court of Common Pleas, explained in his treatise on the laws of England that "ancient" attitudes, prevailing in the feudal ages, held a "very low and contemptuous opinion of all personal estate[.]" 2 W. Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND *384–85 (1766). During that time, personal property was regarded as a "transient commodity" of little concern—unlike "things that are in their nature more permanent and *immovable*, [such] as lands, and houses, and the profits issuing thereout." *Id*. (emphasis in original) (alteration added). Accordingly, Blackstone noted that England's "ancient law-books, which are founded upon the feudal provisions, do not therefore often condescend to regulate this species of property." *Id*. Blackstone attributed this attitude, in part, to the fact that the "amount" of personal property, as compared to real property, was "very trifling[.]" *Id*. at *384.

However, Blackstone explained that by the second half of the 18th century, different ideas of personal property had taken hold due to the significant expansion of trade and commerce. *Id*. at *384–85. Thus, unlike the feudal ages, in Blackstone's time, courts of England regarded "a man's personalty [(i.e., personal property)] in a light nearly, if not quite, equal to his realty [(i.e., real property)]." *Id*. at *385 (alterations added). As to "chattels personal"—of the inanimate variety (e.g., movable goods)—its owner had the right to enjoy the chattel, and have the enjoyment of it,

"solely and exclusively" and with "occupation" of it. *Id*. at \*387, \*389; *see also Rebo*, 168 Idaho at 240–41, 482 P.3d at 575–76 (explaining that property rights are conceived as a "bundle of sticks"). During Blackstone's time, two "species" of injury to rights in personal property were actionable: (1) the "amotion" (removal) or "deprivation" of possession of the chattel; and (2) the "abuse" of, or "damage" to, the chattel. 3 W. Blackstone, COMMENTARIES \*146 (1768).

However, later in his treatise, Blackstone explained that a "trespass" stands for many types of wrongs: A "trespass" in its "largest and most extensive sense, signifies *any* transgression or offense against the law of nature, of society, or of the country in which we live; whether it relate[s] to a man's person, *or his property*." *Id*. at \*209 (emphasis and alteration added). For example, Blackstone explained that "beating another" is a trespass (for which actions of "assault and battery" may lie) and "taking or detaining a man's goods" are also trespasses (for which actions of "trover and conversion" may lie). *Id*. Consistent with this, the "earliest cases" of trespass to chattel involved "asportation, or carrying off" another's chattel. W. Keeton, D. Dobbs, R. Keeton, & D. Owen, PROSSER & KEETON ON THE LAW OF TORTS 85 (5th ed. 1984). But during Blackstone's time, "the action was extended to include cases where the goods were damaged but not taken[,]"— and in the time following Blackstone—courts further "extended the tort to include any direct and immediate intentional interference with a chattel in the possession of another." *Id*.

Notably, there is a "division of opinion" among scholars, and "a surprising dearth of authority" (including in Idaho) on whether a trespass to chattel was actionable when "the defendant merely interferes" with a chattel "without doing any harm—as where, for example, he merely lays hands upon the plaintiff's horse, or sits in his car[.]" *Id*. at 87. Nevertheless, whether a "trespass" was *actionable* in the absence of damages at common law is beside the point for purposes of determining legal relations under the Fourth Amendment. *See* RESTATEMENT (FIRST) OF TORTS § 217 cmt. a (1934) (explaining that a "trespass" to chattel, "though not actionable . . . may nevertheless be important in the determination of the legal relations of the parties."). The property-based test is only concerned with *when* a trespass occurs—not whether that particular trespass was actionable, i.e., whether that trespass could be remedied through a cause of action at common law. *See Jones*, 565 U.S. at 405.

The answer to this question is plain: At common law, a "trespass" to chattel occurs when an actor violates "the dignitary interest in the inviolability of chattels," PROSSER & KEETON, at 87, i.e., those "interests" that comprise the "bundle of sticks" (e.g., the right to use, possess, and

9

exclude). *See Rebo*, 168 Idaho at 240–41, 482 P.3d at 575–76. An actor violates such interests "either by intentionally using *or otherwise intermeddling* with a chattel in the possession of another or by continuing to use or intermeddle therewith after a privilege to do so has been terminated." RESTATEMENT (FIRST) OF TORTS § 217 (1934) (emphasis added); *see also* RESTATEMENT (SECOND) OF TORTS § 217 (1965) ("A trespass to chattel may be committed by intentionally . . . intermeddling with a chattel in the possession of another."). That the trespass is committed by a drug dog—and not its handler—is of no import. *See* 3 W. Blackstone, COMMENTARIES *211 (1768) ("A man is answerable for not only his own trespass, but that of his cattle also[.]" (capitalization deleted)); *Randall*, 169 Idaho at 369, 496 P.3d at 855.

This requirement of "intermeddling" is rooted in the development of common law trespass to chattel starting with "abuse" of chattel, 3 W. Blackstone, COMMENTARIES *146 (1768), the broad notion of a "trespass" as *any* "transgression" against a person's "property," *id.* at 208—and moving towards a trespass as any "interference" with another's chattel by "intermeddlers[,]" PROSSER & KEETON, at 85. The Restatement defines "intermeddling" as "intentionally bringing about a physical contact with the chattel . . . . as when [an actor] beats another's horse or dog, or by intentionally directing an object or missile against it[.]" RESTATEMENT (SECOND) OF TORTS § 217 cmt. e (1965) (alterations added). But a trespassory physical contact can also occur indirectly, as when an actor "deliberately" drives or frightens a "herd of sheep . . . down a declivity." *Id*.

In accord with this heightened form of contact, historically, "intermeddling" meant "[i]nterposing officiously" or "intruding[,]" *Intermeddling*, WEBSTER'S DICTIONARY (1828), https://webstersdictionary1828.com/Dictionary/intermeddling (last visited Feb. 23, 2023); its root term—"meddle"—meant "[t]o have to do; to touch; to handle[,] *Meddle*, WEBSTER'S DICTIONARY (1828), https://webstersdictionary1828.com/Dictionary/meddle (last visited Feb. 23, 2023); and the overall term can also be traced to the word "medletum" in old English law, which meant "[a]n offense suddenly committed in an affray . . . . An intermeddling, without violence, in any matter of business." *Medletum*, BLACK'S LAW DICTIONARY (1st ed. 1891).

What heightened contact with another's chattel amounts to "intermeddling"—thereby violating the dignitary or property interests in the inviolability of that chattel—is often relatively straightforward. *See Jardines*, 569 U.S. at 11 ("One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy."). For example, it has been held that "when a horse is hitched where he has a right to be, it is a trespass upon the part of another to unhitch and remove

10

him against the will of the owner to another position, however near." *Guttner v. Pacific Steam Whaling Co.*, 96 F. 617, 620 (N.D. Cal. 1899). This form of "intermeddling" contact with another's chattel, even without violence or injury, is a "trespass" because it is plainly a directed interference with another's right to possess and exclude, done without privilege or consent.

Likewise, it is a (continuing) "trespass" to, without privilege or consent, make "persistent contact[,]" RESTATEMENT (FIRST) OF TORTS § 217 cmt. c (1934), with another's chattel and interfere with another's "sole[] and exclusive[]" right to "occupation" of it, 2 W. Blackstone, COMMENTARIES *387, *389 (1766). *See, e.g.*, *Jones*, 565 U.S. at 404–05 (holding that the government's "installation of a GPS device" to occupy the undercarriage of a "target's" vehicle was a "trespass" even though "no damage [is done] at all" (alteration added) (quoting *Entick v. Carrington*, 95 Eng. Rep. 807, 817 (C.P. 1765)); *Taylor v. City of Saginaw*, 922 F.3d 328, 333 (2019) (holding that chalk lines occupying the tires of a parked vehicle was a "trespass" to chattel).

By analogy to real property, it is also a trespass to, without privilege or consent, enter *into* a chattel, and breach what amounts to its "close" no different than it is a trespass to, without privilege or consent, breach the "close" that surrounds private parcels of land: "Every unwarrantable entry on another's soil the law entitles a trespass by *breaking his close* . . . . For every man's land is in the eye of the law enclosed and set apart from his neighbors" either by a "visible and material fence"—or by "an ideal invisible boundary, existing only in the contemplation of the law[.]" 3 Blackstone, COMMENTARIES *210 (1768) (emphasis in original and alterations added); *see Jones*, 565 U.S. at 405 (citing *Entick*, 95 Eng. Rep. at 817 for a similar principle); *see, e.g.*, *Randall*, 169 Idaho at 368–69, 496 P.3d at 854–55 (applying this principle to hold a drug dog's intrusion into the interior of a vehicle is a common law trespass); *Howard*, 169 Idaho at 382, 496 P.3d at 868 (applying the same).

This brings us to an important point: The physical contact with the chattel must amount to "intermeddling" for a "trespass" to occur, and although some contact to the exterior surface of a chattel in every-day type commotions will be insufficient, entering *into* another's chattel—and thereby intruding against the inviolability of the chattel's "close"—is a form of "intermeddling" that suffers no de minimus exception. *See Howard*, 169 Idaho at 382, 496 P.3d at 868; *cf.* 3 W. Blackstone, COMMENTARIES *210 (1768). Intermeddling is the difference between someone who brushes up against your purse while walking by—and someone who, without privilege or consent, rests their hand *on* your purse or puts their fingers *into* your purse before your eyes or behind your

11

back. It is also the difference between a dog's tail that brushes against the bumper of your vehicle as it walks by—and a dog who, without privilege or consent, approaches your vehicle to jump *on* its roof, sit *on* its hood, stand *on* its window or door—or enter *into* your vehicle, *see, e.g.*, *Randall*, 169 Idaho at 368–69, 496 P.3d at 854–55; *Howard*, 169 Idaho at 382, 496 P.3d at 868.

In other words, although personal property interests protected by the Fourth Amendment, such as the right to possess and exclude, are not implicated by forms of contact that are less than "intermeddling"—the Amendment is certainly implicated in situations like those above, where no one would dispute the dignitary interest in maintaining the inviolability of one's chattel. If someone directs their hand on or into your purse, or their dog jumps on or into your vehicle, without privilege or consent, no one (including common-sense) could doubt your *right* to protest and exclaim: "Hey! Hands-off my purse!" or "Hey! Get your dog off my car!" *See* RESTATEMENT (FIRST) OF TORTS § 217 cmt. a (explaining that while a "trespass to another's chattel" might not be *actionable* at common law without damage it can, in certain circumstances, afford "the possessor a privilege to use force to defend his interest in its exclusive possession"); *cf. Jardines*, 569 U.S. at 13 (Kagan, J., concurring) (noting that property and privacy concepts can "align" as the "law of property naturally enough influences our shared social expectations of what places should be free from governmental incursions" (cleaned up)).

Notably, when a drug dog simply sniffs the air surrounding a vehicle, it is not a "search" under the Fourth Amendment's "reasonable expectation of privacy" test because there is no "privacy" interest in the free-air that surrounds a vehicle. *See Caballes*, 543 U.S. at 409–10. Likewise, a sniff of the free-air surrounding a vehicle is not a "search" under the property-based test because chattels do not have a protected area of "curtilage"—unlike their textual counterpart in real property: homes. *See Jardines*, 569 U.S. at 7 ("Just as the distinction between the home and the open fields is 'as old as the common law,' so too is the identity of the home and what Blackstone called the 'curtilage or homestall,' for the 'house protects and privileges all its branches and appurtenants.' " (citation omitted) (quoting in part 4 W. Blackstone, COMMENTARIES \*223, \*225 (1769)). However, under the property-based test, a Fourth Amendment "search" *will* occur when the government trespasses against private property for the purpose of obtaining information. *Jones*, 565 U.S. at 404.

In sum, a drug dog sniff is an "activity that is self-evidently conducted for the purpose of obtaining information[,]" *Howard*, 169 Idaho at 382, 496 P.3d at 868, and a drug dog trespasses

against a vehicle by "intermeddling" with its exterior—or its interior (i.e., breaching its "close")—without privilege or consent. *See Randall*, 169 Idaho at 370, 496 P.3d at 856. Both forms of "intermeddling" violate the dignitary interest in the inviolability of a chattel. More specifically, and depending on the circumstances, such "intermeddling" violates the rights to possess, use, or exclude, or some combination of these rights. *See Rebo*, 168 Idaho at 240–41, 482 P.3d at 575–76. Like most Fourth Amendment questions, whether the government's conduct amounts to "intermeddling" is an objective, but often fact-intensive inquiry. *See Jardines*, 569 U.S. at 10; *Randall*, 169 Idaho at 369, 496 P.3d at 855 (explaining that the property-based test is objective such that the drug dog's "motivation, instinctual or otherwise, is irrelevant.").

Applying these principles to the instant case, a Fourth Amendment "search" occurred here because the State's drug dog, Nero, intermeddled with (and thereby trespassed against) Dorff's vehicle for the purpose of obtaining information. As a preliminary matter, it cannot be overemphasized that a "search" occurred here because Nero trespassed against Dorff's vehicle *for the purpose of* obtaining information about, or related to, *the vehicle*. *See Jones*, 565 U.S. at 404 ("We hold that the Government's installation of a GPS device on a target's vehicle, and its use of that devise *to monitor the vehicle's movements*, constitutes a "search.") (emphasis added)). This is plainly distinguishable from a case where, for example, a police officer leans up against a driver's vehicle as he gathers information from the driver about, or related to, a lawful traffic stop (e.g., the driver's license, registration, and insurance). In that case, there is no "search" of the vehicle.

However, whether an officer conducts a "search" as he leans against the vehicle, gathers information from the driver—*and* contorts his head to claim he saw contraband within the vehicle in "open view"—is a question we must leave for another day. *Cf. State v. Albertson*, 165 Idaho 126, 131, 443 P.3d 140, 145 (2019) (applying the "open view doctrine" in the context of curtilage and the "implied licensed" doctrine from *Jardines*, 569 U.S. at 10, while recognizing that an Idaho trespass statute—written in the 21st century—cannot inform common law trespass principles for purposes of the property-based Fourth Amendment test).

Returning to Nero's sniff, the district court found—based solely on two body-cam videos from the on-scene officers—that Nero made two passes around Dorff's vehicle, and that Nero placed his "paws" on the vehicle "three" times, for a "very, very brief period of time." A review of the same footage on appeal, which we freely review in these circumstances, *Andersen*, 164 Idaho at 312, 429 P.3d at 853, shows that during his second pass, Nero jumped towards the vehicle

13

on the passenger side two times. However, from the footage alone, it cannot be discerned whether Nero actually stood on the vehicle's doors or windows during these instances with his paws.

Nevertheless, when Nero approached the driver's side on his second pass, he clearly trespassed against Dorff's vehicle. The footage reflects that when Nero reached the front driver side door, he jumped up onto the door, and planted his two front paws on the door (and then the window) as he sniffed the upper seams of the vehicle. Although the length of time Nero had his paws on the vehicle is not dispositive of whether Nero's doing so amounted to intermeddling, the seconds that do pass while Nero stood on, and occupied, Dorff's vehicle—without privilege or Dorff's consent—is enough to objectively constitute a wrongful trespass against, and intermeddling with, Dorff's vehicle, and his right to exclude. And as we have said before, "there is no asterisk to the Fourth Amendment excusing the unconstitutional acts of law enforcement when they are accomplished by means of a trained dog." *Howard*, 169 Idaho at 382, 496 P.3d at 868. Thus, although it was accomplished by Nero, it was law enforcement who violated Dorff's dignitary interest in maintaining the inviolability of his chattel.

In sum, a warrantless Fourth Amendment "search" occurred when Nero trespassed against Dorff's vehicle for the purpose of obtaining information about, or related to, the vehicle. The State has not argued that an exception to the warrant requirement applies. Accordingly, the district court erred when it determined that Dorff's Fourth Amendment rights were not violated.

## IV. CONCLUSION

For the foregoing reasons, Dorff's judgment of conviction is vacated, the district court's order denying his motion to suppress is reversed, and this case is remanded.

Justices STEGNER and ZAHN, concur.


MOELLER, J., dissenting.

I write separately to register my dissent with the majority's opinion and its deviation from the bright-line standards we recently announced in *State v. Randall*, 169 Idaho 358, 496 P.3d 844 (2021), and *State v. Howard*, 169 Idaho 379, 496 P.3d 865 (2021). In both cases we clarified our dog sniff jurisprudence to craft a clear rule: that any entry by a drug dog *into a vehicle*, even if only its nose, transforms a lawful drug sniff into an unconstitutional search under the Fourth Amendment. Unfortunately, the majority's decision will return us to the murky and uncertain legal waters from which we just extricated ourselves.

I agree with the majority that at its core, the Fourth Amendment is "an 18th-century guarantee against unreasonable searches." *United States v. Jones*, 565 U.S. 400, 411 (2012). Our duty is to "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Id.* at 406 (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). However, it is the concept of reasonableness, implicit in all Fourth Amendment cases, that leads me to a different conclusion in this case. Unlike Pico's (*Howard*) and Bingo's (*Randall*) physical intrusions into the defendants' vehicles, or the intrusion onto Jardines' curtilage in *Florida v. Jardines*, 569 U.S. 1, 10–11 (2013), I cannot agree that an unreasonable search or a physical intrusion occurred just because Nero's paws briefly touched the exterior of Dorff's vehicle. It cannot be said that Nero, acting as a tool of law enforcement, "physically occupied private property for the purpose of obtaining information." *Jones*, 565 U.S. at 404. The two-part test in *Jones*—(1) a physical intrusion combined with (2) a purpose of obtaining information—has not been met. *Jones*, 565 U.S. at 404; *Randall*, 169 Idaho at 369, 496 P.3d at 855.

First and foremost, Nero's brief contact with the car windows indisputably occurred on the *exterior* of the vehicle. Bearing in mind that adherence to property baselines in Fourth Amendment cases "keeps easy cases easy," *Jardines*, 569 U.S. at 11, I note that the exterior of a vehicle has been long held to be an area that does not implicate legitimate privacy interests in dog sniff jurisprudence. *See, e.g.*, *Illinois v. Caballes*, 543 U.S. 405, 409 (2005) (noting that the dog sniff occurred outside the vehicle and holding that "the use of a well-trained narcotics-detection dog . . . during a lawful traffic stop, generally does not implicate legitimate privacy interests."); *State v. Howard*, 169 Idaho 379, 382, 496 P.3d 865, 868 (2021) ("neither a warrant nor warrant exception is required for an exterior sniff of a car by a reliable drug dog."); *United States v. Olivera-Mendez*, 484 F.3d 505, 511 (8th Cir. 2007) ("A dog sniff of the exterior of a vehicle does not constitute a search."). Indeed, our decisions in *Randall* and *Howard* clearly relied on the property baseline between the exterior and interior of the car: "though an *exterior* sniff of a car is not a search under *Caballes*, it becomes a search under *Jones* when a drug dog trespasses into the car's *interior*." *Randall*, 169 Idaho at 370, 496 P.3d at 856 (emphasis added).

I disagree with the majority's conclusion that the placement of Nero's front paws on a side window of the car—while conducting a permissible *exterior sniff* of the vehicle for contraband— amounts to a physical intrusion that compromised Dorff's privacy interests. As courts have repeatedly held, dog searches are "sui generis" in our Fourth Amendment jurisprudence. *Id.* at 366,

15

496 P.3d at 852. When a dog is circling the vehicle's exterior to detect the presence of narcotics, any minimal or incidental contact with the outside of the vehicle—whether instinctive or directed by the handler[1]—does not inherently implicate the Fourth Amendment. As established in *Caballes*,

> Official conduct that does not compromise any legitimate interest in privacy is not a search subject to the Fourth Amendment. We have held that any interest in possessing contraband cannot be deemed "legitimate," and thus, governmental conduct that only reveals the possession of contraband "compromises no legitimate privacy interest." . . . [A] canine sniff by a well-trained narcotics-detection dog [is] "sui generis" because it discloses only the presence or absence of narcotics, a contraband item. . . .
>
> Accordingly, the use of a well-trained narcotics-detection dog—one that does not expose noncontraband items that otherwise would remain hidden from public view—during a lawful traffic stop, generally does not implicate legitimate privacy interests.

*Id.* (quoting *Caballes*, 543 U.S. at 408–09).

I find our sister jurisdictions' consideration of this specific issue instructive. Before *Jones*, Fourth Amendment cases rarely contemplated a drug dog's physical contact with a vehicle's exterior during an investigative sniff. *U.S. v. Olivera-Mendez* is a rare example from the Eighth Circuit. 484 F.3d 505, 511–12 (8th Cir. 2007). In that case, the dog "jumped and placed his front paws on the body of the car in several places during a walk-around sniff that took less than one minute." *Id.* The Eighth Circuit concluded that this was a "minimal and incidental contact with the exterior of the car," and "did not rise to the level of a constitutionally cognizable infringement." *Id.* (internal quotation marks omitted). While *Olivera-Mendez* preceded *Jones*, other courts have recently applied *Olivera-Mendez* to conclude that brief touches with a vehicle do not constitute searches under the Fourth Amendment. *United States v. Owens*, 2015 WL 6445320, at \*9 (D. Me. 2015), *aff'd*, 917 F.3d 26 (1st Cir. 2019) (officer placing hand over vehicle's hood to determine whether it had been recently driven was "momentary contact" and not an "intrusion" under *Jones* and *Jardines*); *United States v. Zabokrtsky*, 2020 WL 1082583, at \*6 (D. Kan. Mar. 6, 2020) (applying *Olivera-Mendez* instead of *Jones* to determine the dog's paws against the body the vehicle was only "minimal and incidental contact" during the sniff). I would conclude that Nero's

---

[1] Drug dogs are investigatory tools of law enforcement. "[W]e will not regard drug dogs as highly trained tools of law enforcement when their behavior is consistent with the limitations of the Fourth Amendment, and then regard them as mere dogs when their behavior runs afoul of it. At bottom, law enforcement is wholly responsible for the training and deployment of drug dogs; it is likewise wholly responsible when, as a result of their training and deployment, dogs enter vehicles during exterior sniffs." *Randall*, 169 Idaho at 369, 496 P.3d at 855.

contact with the vehicle's exterior here was likewise a minimal and incidental contact to generally sniff the exterior area around the vehicle.

The inquiry here should turn on whether there was an unreasonable governmental *intrusion* into the privacy and property interests protected by the Fourth Amendment, and the court's duty to "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." *Jones*, 565 U.S. at 406. This is in line with longstanding Fourth Amendment cases where the Court has "uniformly [] held that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or a 'legitimate expectation of privacy' that has been *invaded* by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (emphasis added). Here, I do not find that Nero's brief contact with the exterior of the vehicle constituted such an intrusion.

The majority's analysis suggests that any contact with a defendant's vehicle—however brief, minimal, or incidental to the dog sniff—would create an unreasonable search. This could include the dog's nose brushing against a car bumper as it sniffed for contraband. It may even include the swipe of a dog's tail along the vehicle as it followed its handler in circling the car. While a dog's paws convey no olfactory information, they allow the dog to sniff higher. Likewise, just as pressing their nose against a door crack allows a drug dog to detect faint smells, wagging their tails against the car may stir the scent emanating from the car around them. In sum, drug dogs are highly trained animals that use their entire bodies when attempting to pick up a scent. This minimal contact *outside the vehicle* is not police misconduct; it's just a dog behaving like a dog. In *Howard* and *Randall* we concluded such instinctive behavior does not justify an intrusion into the interior of a car. To be clear, I reiterate our holdings there that police are responsible for training and controlling drug dogs as tools of law enforcement, and that their use must respect the confines of the Fourth Amendment. *Randall*, 169 Idaho at 369, 496 P.3d at 855. But here, Nero's paw placement was a brief, minimal touch with the car for the dog to do exactly what it was trained for—to sniff the air *outside* the vehicle.

Under the majority's ruling, these minimal exterior contacts are now viewed as a "physical occupation" or "trespass." We previously eschewed such an approach in *State v. Albertson*, where we held: "there is no constitutional nexus between criminal or civil trespass laws and Fourth Amendment jurisprudence." 165 Idaho 126, 130–31, 443 P.3d 140, 144–45 (2019). We further explained why such an approach to the Fourth Amendment is untenable: "trespass laws are not

17

rooted in the same constitutional soil from whence the reasonable expectation of privacy standard has grown. Therefore, Idaho's trespass laws are not controlling in this case, which concerns the application of the Fourth Amendment to [a search related to] a controlled substance charge." *Id*. (citing *Kyllo*, 533 U.S. at 34 ). Ultimately, as in all Fourth Amendment challenges, this case should be analyzed using a reasonable expectation of privacy analysis, not as a trespass.

The majority's analysis will lead to other absurd and troubling possibilities. If a dog placing its paws against a car is now tantamount to a trespass, what happens when an officer leans against a car door as he speaks with the driver? If the officer's leaning facilitates a better view of the car's interior, how is this any different from Nero's actions? Will this now be deemed an unreasonable search simply because he *touched* the car while asking questions to *obtain information* during the course of a traffic stop? The majority's ruling essentially warns law enforcement to keep their hands—or in Nero's case, his paws—off a suspect's vehicle or risk committing a trespass.

A more reasonable interpretation of the holding in *Jones* shows that it was meant to bar invasive conduct by the State that infiltrates constitutionally protected areas; it should not be read in ways that force courts to police *un-intrusive* contact.

> The [Fourth] Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred."

*Jardines*, 569 U.S. at 5 (quoting *Jones*, 565 U.S. at 407 n.3 (Sotomayor, J., concurring)). *See also Kyllo*, 533 U.S. at 40 (a search occurs where "the Government uses a device that is not in general public use, to explore details of the home *that would previously have been unknowable without physical intrusion*.") (emphasis added); *U.S. v. Knotts*, 460 U.S. 276, 286 (1983) ("when the government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment.").

Ultimately, as in *Caballes* and many similar cases, the drug dog here only executed a sniff around the exterior of a defendant's vehicle during an ongoing lawful traffic stop. I do not agree that Nero's simple placement of his paws on the car window or door somehow transformed this sniff into an impermissible search or seizure of the vehicle under the Fourth Amendment. Thus, I would hold that suppression was not warranted under these circumstances and I would affirm the

district court's order denying Dorff's motion to suppress the evidence. Accordingly, I must respectfully dissent.

BEVAN, Chief Justice, dissenting:

I join with Justice Moeller's dissent, but I write separately to reiterate my view that a dog's instinctual acts do not violate the Fourth Amendment. Indeed, as I have explained, "I do not believe that a drug-detection dog's instinctive action instantaneously transmutes a warrantless, exterior sniff into an unconstitutional search." *State v. Howard*, 169 Idaho 379, 386, 496 P.3d 865, 872 (2021) (Bevan, C.J., dissenting). It remains my view that a dog's instinct to jump cannot be imputed to its officer-handler when the dog acts without instruction. *See State v. Randall*, 169 Idaho 358, 374, 496 P.3d 844, 860 (2021) ("a dog is a dog and takes certain actions instinctively."). For the majority to equate a drug dog instinctually jumping onto the exterior of a car to a government agent intentionally affixing a GPS tracking device to the undercarriage of a vehicle and monitoring its location for four weeks, as occurred in *United States v. Jones*, 565 U.S. 400 (2012), stretches logic beyond the breaking point of reasonableness, which, after all, is "the ultimate touchstone of the Fourth Amendment. . . ." *State v. Blancas*, 170 Idaho 631, 515 P.3d 718, 721 (2022). *See also Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

Reasonableness thus requires us to consider the degree of the government intrusion, not to simply suppress all evidence where *any* intrusion occurred. My warning from *Randall* remains apropos. *See* 169 Idaho at 378, 496 P.3d at 864 ("[T]he Fourth Amendment addresses "misuse of power," not the accidental effects of otherwise lawful government conduct." *Brower v. Cnty. of Inyo*, 489 U.S. 593, 596 (1989) (quoting *Byars v. United States*, 273 U.S. 28, 33 (1927)). The majority's decision today effectively converts Idaho's analysis of the Fourth Amendment into a strict liability system, where the officer-handler's intent and the extent of the intrusion are irrelevant. Such a response is unsupportable under the goals of the exclusionary rule. *See Randall*, 169 Idaho at 373, 496 P.3d at 859. I would affirm the district court's order denying Dorff's motion to suppress. Accordingly, I dissent.